**GENERAL DYNAMICS CORPORATION,**
**and Electric Boat Corporation,**
**Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 99–45C, 99–865C.**

United States Court of Federal Claims.

Sept. 15, 2000.

516

Richard C. Johnson, Washington, D.C., attorney of record for plaintiffs.

John E. Kosloske, Washington, D.C., with whom was Assistant Attorney General David W. Ogden, attorneys for defendant.

## OPINION

LYDON, Senior Judge.

These claims, brought under the Contract Disputes Act of 1978 (41 U.S.C. Sec. 601, et seq.), are before the court on plaintiffs' motion for an order finding jurisdiction and for partial summary judgment, and on defendant's cross-motion to dismiss. The initial claim was filed by General Dynamics Corporation (No. 99–45C). The claim of Electric Boat Corporation (No. 99–865C), a wholly-owned subsidiary of General Dynamics Corporation, is based on the same contract and breach of contract theory as the General Dynamics claim and was filed as a protective pleading in response to a jurisdictional issue raised by the Government. The two claims have been consolidated.

Plaintiffs contend that the contract with defendant—to design a nuclear submarine—was breached by a federal statute capping senior executive compensation as an allowable cost under the contract, thereby reducing the amount of costs plaintiffs could recover under the terms of the preexisting contract. Plaintiffs claim damages in the amount of $1,023,000. Defendant asserts that the instant claims should be dismissed because the court does not have jurisdiction over either claim, and, in any event, because the contract was not breached by the subject statute.

For the reasons set forth below, the court finds that it has jurisdiction over the claim of General Dynamics Corporation (No. 99–45C). Accordingly, the protective claim of Electric Boat Corporation (No. 99–865C) is superfluous. The court further holds that the contract at issue has been breached by the Government. Therefore, the court denies defendant's motion to dismiss the claim of General Dynamics Corporation, while granting defendant's motion to dismiss (as unnecessary) the protective claim of Electric Boat Corporation. The court also grants General Dynamics Corporation's motion for summary judgment on the issue of liability.

## FACTS

General Dynamics Corporation (GDC) is a corporation organized under the laws of Delaware and headquartered in Falls Church, Virginia. GDC and its subsidiaries perform contracts and subcontracts for the United States for the construction of nuclear submarines, surface combatant ships, main battle tanks and other military vehicles, and also manufacture other defense and non-defense items. One of GDC's business units until 1995 was General Dynamics Electric Boat Division (EBD), located in Groton, Connecticut. On September 25, 1995 EBD was reorganized by GDC into a wholly owned subsidiary called Electric Boat Corporation (EBC). The certificate of incorporation was filed in the State of Delaware on October 11, 1995.

On September 26, 1995, during the period of Electric Boat Division's reorganization into EBC, Stephen J. Filan, a contracting officer at the Department of the Navy, Naval Sea Systems Command (NAVSEA), in Arlington, Virginia, sent a solicitation for the development of a design for the Virginia-class nuclear submarine to "General Dynamics / Electric Boat Division" in Groton, Connecticut, requesting the submission of a cost-

plus-fixed-fee contract proposal.[1] On November 15, 1995 senior executives of EBC *and* GDC co-signed an "Authorization for Proposal/Contract" giving Electric Boat *Division* a green light to bid on the nuclear submarine contract. This authorization accorded with GDC corporate policy, which delegated authority to GDC's subsidiaries and other business units to enter into contracts "for, or in the name of, and on behalf of the Company [General Dynamics Corporation]" and required that they obtain approval from GDC headquarters before entering into contracts above certain dollar thresholds. With respect to Electric Boat (whether in the form of EBD *or* EBC), that dollar threshold was $100 million. On November 20, 1995, notwithstanding the fact that Electric Boat Corporation had been formed since the contract solicitation was received, a proposal was submitted on letterhead of "GENERAL DYNAMICS, Electric Boat Division." The proposal was signed by "John K. Welch, President—Electric Boat." Mr. Welch was President & CEO of Electric Boat Corporation. He was also a Vice President of GDC.

On January 29, 1996 the Department of the Navy (NAVSEA), awarded a letter contract, Contract No. N00024–96C–2100 ("Contract –2100"), for the detail design of the Virginia-class nuclear submarine.[2] The winning contractor was identified on the initial page of the document in Box 7 (Name and Address of Contractor) as "General Dynamics Corporation, Electric Boat Division, Eastern Point Road, Groton, CT 06340." Signing on behalf of the contractor was "John K. Welch, President & CEO." As previously discussed, Mr. Welch was President & CEO of EBC, as well as a Vice President of GDC. Signing on behalf of the Government was Stephen J. Filan, the NAVSEA procuring contracting officer located in Arlington, Virginia.

The letter contract was definitized in a modification dated May 9, 1996 that was signed by Mr. Filan and John V. Leonard, Jr., EBC's Vice President—Finance. The entry for "Name and Address of Contractor" on the first page of the document was again "General Dynamics Corporation, Electric Boat Division .... Groton, CT ...." The definitization set the total contract price at $1,374,958,371 (including estimated cost, fixed fee and potential performance incentive). The contract does not specify a completion date, but it does contain schedules for installment payments through January 2004 and performance incentive evaluation periods through December 2004.

Thus, it should be noted that the Navy awarded Contract –2100 in the name of General Dynamics Corporation. It was not awarded in the name of Electric Boat Corporation. (Electric Boat Division was never a viable contractor, as will be discussed, *infra.*) This designation of GDC as the "contractor" was consistent with GDC corporate policy, which authorized subsidiaries and other business units to enter contracts *on behalf of GDC.* Neither the letter contract at issue nor the definitization thereof has ever been amended to change the name of the contractor.

Meanwhile, prior to the time the letter contract was issued in January 1996, GDC, EBC and the United States had entered into a Novation Agreement on December 11, 1995 with respect to 321 government contracts that had previously been awarded to GDC. In this Agreement the three parties "acknowledge[d] the following facts:"

— "As of December 11, 1995, the Transferor (GDC) has assigned, conveyed, and transferred to the Transferee (EBC) all the assets of [GDC's] Electric Boat Division by virtue of an agreement between [GDC] and [EBC].

— [EBC], by virtue of said assignment, conveyance and transfer, has acquired

---

1. A cost-plus-fixed-fee contract is a cost-reimbursement contract that "provides for payment of allowable incurred costs, to the extent prescribed in the contract," as well as "a negotiated fee that is fixed at the inception of the contract." 48 C.F.R. Sec. 16.301–1 and 16.306(a) (1995).

2. A letter contract is "a written preliminary contractual instrument that authorizes the contractor to begin immediately manufacturing supplies or performing services." 48 C.F.R. Sec. 16.603–1 (1995).

all the assets of [GDC's] Electric Boat Division.

— [EBC], by virtue of said assignment, conveyance and transfer, has assumed all obligations and liabilities of [GDC] under the [aforementioned] Contracts.

— [EBC] is in position to fully perform the Contracts and .... GDC agrees to guaranty the performance by EBC on all the Contracts and other obligations assigned or transferred to [EBC].

— It is consistent with the Government's interest to recognize [EBC] as the successor party to the [aforementioned] Contracts."

The Novation Agreement went on to state that "[i]n consideration of these facts, the parties agree that ....

— [GDC] .... does hereby waive, any and all claims, demands and rights against the Government which it now has or may hereafter have in connection with the [321] Contracts.

— The Government recognizes [EBC] as [GDC's] successor in interest in and to the [321] Contracts and all claims, demands and rights thereunder.

— [GDC] guarantees payment of all liabilities and the performance of all obligations that [EBC] (i) assumes under this Agreement or (ii) may undertake in the future [with respect to the 321 contracts]."

The Novation Agreement, it should be noted, applied only to contracts in existence on the date of the Agreement—December 11, 1995. It made no provision with respect to post–1995 contracts (like Contract –2100).

On January 22, 1996 GDC executed and delivered to the Government a Guaranty Agreement in which GDC "request[ed] .... the Government to award contracts to Electric Boat Corporation ...." and "agree[d] to guarantee .... the full, complete and faithful performances [by EBC] of any and all contracts awarded to [EBC] during calendar year 1996." Thus, the Guaranty Agreement, by its terms, applied only to contracts awarded to *EBC* during calendar year 1996. Contract –2100, as aforementioned, was awarded to *GDC* (Electric Boat Division). In essence,

therefore, the Guaranty Agreement was superfluous with respect to Contract –2100. GDC considered itself the contractor from the outset and has never denied its obligation to ensure and guarantee the performance of the subject contract.

Subsequent modifications to Contract –2100 were inconsistent in their identification of the "contractor." Thirty-eight modifications were issued by the NAVSEA procuring contracting officer (Mr. Filan) between March 1996 and June 1999 (so-called "P" modifications). Twenty-two of these modifications identify the contractor as "General Dynamics Corporation, Electric Boat Division." Twelve modifications, including most of the later ones, identify the contractor as "Electric Boat Corporation, a General Dynamics Company." Another four modifications identify the contractor as "Electric Boat Corporation." Additionally, from August 1996 to October 1999 over 200 modifications to the contract were issued by the Navy administrative contracting officer assigned to EBC in Groton, Connecticut (so-called "A" modifications). These modifications all identify the contractor as "Electric Boat Corporation."

One of the many Federal Acquisition Regulations (FAR) incorporated by reference into the contract was FAR 52.216–7—ALLOWABLE COST AND PAYMENT (JULY 1991). This regulation (48 C.F.R. Sec. 52.216–7(a)(1995)) provided that:

"[t]he Government shall make payments to the Contractor when requested as work progresses .... in amounts determined to be allowable by the Contracting Officer in accordance with subpart 31.2 of the Federal Acquisition Regulation (FAR) in effect on the date of this contract and the terms of this contract."

FAR subpart 31.2 in effect on the date the parties executed and definitized Contract –2100 in 1996 defined the allowability and allocability of costs incurred in cost-reimbursement contracts (like Contract –2100) through general provisions including FAR 31.201–1 ("Composition of total cost"), FAR 31.201–2 ("Determining allowability"), FAR 31.201–3 ("Determining reasonableness"), FAR 31.201–4 ("Determining allocability"),

and FAR 31.204 ("Application of principles and procedures"), as well as in provisions addressing specific costs (FAR sections 31.205–1 through –52). None of these provisions imposed any fixed or numerical limitation on the allowability of executive compensation costs with respect to Contract –2100. The only monetary limitation on the allowability of executive compensation costs was the requirement that they be reasonable. FAR 31.205.6(b) specifically governed the reasonableness of compensation for all personal services. Among the factors to consider were the compensation practices of other firms of like size, in the same industry, in the same geographic area, or engaged in predominantly non-Government work, as well as the cost of comparable services obtainable from outside sources. FAR 31.205–6(b)(1).

For GDC and its subsidiaries the allowability of executive compensation costs is determined by the corporate administrative contracting officer (CACO)—a government contracting officer assigned to GDC's corporate headquarters—through a discretionary application of the relevant regulations. The CACO's determination generally follows an audit by the Defense Contract Audit Agency (DCAA). The DCAA conducts periodic compensation system reviews (CSRs) of GDC's personnel at headquarters and at its business segments. A CSR is typically performed every second contractor fiscal year and the results are utilized in connection with the examination of the fiscal year for which the CSR was not performed. DCAA reviews executive compensation costs of GDC and its subsidiaries as part of its standard audits of incurred costs. There is typically a lag of several years between the completion of DCAA's audits and the fiscal years they cover.

DCAA issued the fiscal year 1993 CSR on December 4, 1996. DCAA determined therein that compensation costs for the leading executives at GDC headquarters and its Electric Boat Division in fiscal year 1993 were allowable in the following amounts:

| | | |
|---|---|---|
| GDC headquarters: | Chairman & CEO | $1,482,662 |
| | President & COO | (Total of |
| | Vice Chairman | $1,594,285) |
| Electric Boat: | Executive Vice President | $ 608,850 |
| | President & Corp. V.P. | $ 384,478 |
| | Controller | $ 218,735. |

DCAA also determined that there was additional "unreasonable compensation" of the above headquarters personnel amounting to $1,139,670 and of the above Electric Boat personnel amounting to $200,250. GDC disputed these findings of the 1993 CSR. In early 1999 the CACO and GDC reached a settlement allowing the headquarters compensation costs that had initially been found "unreasonable" in the December 1996 report. In a letter memorializing this settlement, dated January 27, 1999, GDC's Paul Steckley (Staff Vice President, Internal Audit and Government Accounting) wrote to the (Corporate) Administrative Contracting Officer, Raymond Eichman, that "[t]he purpose of this letter is to confirm our agreement regarding certain General Dynamics costs included in the 1993 Corporate Overhead submittal . . . . . [W]e have agreed that $1,139,670 in questioned compensation costs will be in-

cluded . . . . as allowable and allocable costs." The letter was countersigned by Mr. Eichman. According to this settlement the allowable compensation costs in 1993 would have risen to $1,950,168 for GDC's Chairman & CEO and a total of $2,266,449 for GDC's President & COO and Vice Chairman ($1,227,224 and $1,039,225, respectively).

The record also contains documentation, though incomplete, relating to DCAA's audit of GDC for *calendar* year 1992. (The parties have not explained why the 1992 audit was based on the calendar year, while the 1993 audit was based on the fiscal year, or whether one document was simply mistaken.) According to a memorandum dated September 22, 1997, DCAA applied substantially the same cash compensation figures to executives at GDC's headquarters and business segments for 1992 as it did for 1993 (since GDC apparently did not furnish raw data for 1992)

and used the same "cost questioned percentage" from the 1993 audit to calculate questionable executive compensation costs for calendar year 1992. This resulted in questioned compensation costs totalling $1,077,587 at GDC headquarters and $118,326 at Electric Boat Division. The parties state that the DCAA audit for 1992 is final, though the record does not indicate how this particular dispute was resolved. In any event, DCAA appears to have allowed roughly the same amounts of executive compensation costs to GDC and its business segments for 1992 as it did for 1993.

According to the information furnished by the parties, as of the date of oral argument, no further audits have yet been issued for subsequent years.

### Executive Compensation Cap

On November 18, 1997 the National Defense Authorization Act for Fiscal Year 1998, Public Law No. 105–85, 111 Stat. 1629, was enacted (FY 98 Authorization Act). Sec. 808 of the Act imposed a cap on defense contractors' allowable costs of "senior executive" compensation by making unallowable all such costs that exceed a "benchmark compensation amount" to be determined annually by the Administrator for Federal Procurement Policy. The cap applied to "covered contracts"—defined as cost-reimbursement and fixed-price incentive contracts in excess of $500,000 (adjustable every five years to account for inflation) but not to fixed-price contracts without cost incentives or firm fixed-price contracts for the purchase of commercial items. The cap applied to all senior executive compensation costs incurred by defense contractors after January 1, 1998, regardless of whether the contracts were executed after that date or were already in existence prior to January 1, 1998. The term "compensation" was defined as the total amount of wages, salary, bonuses and deferred compensation for the year, whether paid, earned, or otherwise accruing. The term "senior executive" was defined as (A) the CEO of the contractor or anyone acting in a similar capacity, (B) the contractor's other four most highly compensated management personnel, and (C) in the case of a

contractor with components reporting directly to its headquarters, the five highest compensated management personnel at each component. P.L. 105–85, Sec. 808(a), (e), (g); 111 Stat. at 1835, 1837; codified at 10 U.S.C. Sec. 2324(e)(1)(P) and Sec. 2324(*l*)(1), (*l*)(4) and (*l*)(5).

In a Federal Register notice on February 23, 1998, the Administrator for Federal Procurement Policy announced a "benchmark compensation amount" of $340,650 for fiscal year 1998 on allowable costs for senior executive compensation in covered contracts. 63 Fed.Reg. 8981. Thus, the cap limited the allowable compensation costs of any individual "senior executive," as defined in the Act, to $340,650 in FY 1998.

On October 17, 1998 the Strom Thurmond National Defense Authorization Act for Fiscal Year 1999, Public Law No. 105–261, 112 Stat.1920, was enacted (FY 99 Authorization Act). Sec. 804(a) of this Act amended the definition of senior executives subject to the compensation cap to provide that "the term 'senior executives', with respect to a contractor, means the five most highly compensated employees in management positions at each home office and each segment of a contractor." 112 Stat. at 2083, codified at 10 U.S.C. Sec. 2324(*l*)(5).

On May 26, 1999 the Administrator for Federal Procurement Policy announced a "benchmark compensation amount" of $342,986 for fiscal year 1999 on allowable costs for senior executive compensation in covered contracts. 64 Fed.Reg. 28,529. This figure represented an increase of 0.7 % above the FY 1998 cap.

Meanwhile, on July 24, 1998, *EBC*'s Vice President—Finance (J. V.Leonard, Jr.) wrote a letter to the Navy's administrative contracting officer in Groton, Connecticut, protesting the imposition of the FY 1998 executive compensation cap to contracts entered into before the statute's enactment. Mr. Leonard stated, in pertinent part, that:

> "It is our position that the retroactive application of the executive compensation cost cap constitutes a breach of contract by the Government, and General Dynamics plans to file a breach of contract action against the Government as a result of the

statute. In order to comply with the statute, Electric Boat Corporation will exclude executive compensation costs above the benchmark amount .... [but] nevertheless reserves the right to seek appropriate compensation in the event that the retroactive application of the executive compensation cost cap is determined to be improper. General Dynamics, and any subsidiary or division thereof, does not by accepting the award of any contract or contract modification acquiesce .... in the retroactive application of Section 808 of the [FY 98 Authorization Act] .... to contracts in existence as of November 18, 1997."

On October 5, 1998, *GDC*'s Senior Vice President—Law (David A. Savner) submitted a "Claim for Breach of [Contract −2100]" under the Contract Disputes Act of 1978(CDA) to the CACO at GDC's corporate headquarters in Falls Church, Virginia. He certified the claim "on behalf of General Dynamics." Mr. Savner stated, in pertinent part, that:

> "the government has breached numerous contracts entered into prior to the effective date of the [FY 98 Authorization Act]..... By applying the new executive compensation cap to contracts entered into before the effective date of Section 808, the Government is unilaterally reducing the amount it agreed to pay General Dynamics for its efforts and is thereby breaching those contracts.
>
> The United States Supreme Court held in *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), that the Government is liable for breach of contract when it uses legislation to change the terms of a contractual agreement retroactively under circumstances similar to those present here.....
>
> The Government's breach of contract with respect to executive compensation costs affects numerous contracts between the Government and General Dynamics' subsidiaries. As a test case, General Dynamics has selected a contract between the Government and Electric Boat Corporation ("Electric Boat") that was executed when no compensation cap was in effect.

\* \* \* \* \* \*

On behalf of General Dynamics, I request a contracting officer's final decision pursuant to 41 U.S.C. Sec. 605 ...."

On December 2, 1998, in a letter to *GDC* (Attn: Mr. David A. Savner), the CACO, Mr. Eichman, issued a "Final Decision on Executive Compensation Cap for Contract [−2100]" denying GDC's claim on the grounds that:

> "The contracting officer, as a Government official, does not have the authority to waive statutorily imposed requirements; until a law is repealed or declared unconstitutional by the courts, it must be enforced by the contracting officer.
>
> .... [T]he CACO for GD[C] must enforce the laws enacted by Congress, including the Executive Compensation Cap imposed by Sec. 808 of P.L. 105–85..... [T]he Executive Compensation Cap applies to .... all of GD[C]'s covered contracts, including the referenced contract awarded to EB[C], GD[C]'s wholly-owned subsidiary."

GDC appealed this decision by filing a complaint for breach of contract in the U.S. Court of Federal Claims on January 29, 1999, in accordance with the provisions of the CDA.

### *Jurisdictional Dispute*

In its initial Complaint (No. 99–45C), GDC alleged that it performs contracts and subcontracts for the Government "through various wholly-owned subsidiaries" and that "in matters relating to government contracts and subcontracts the United States considers and has treated General Dynamics as a single entity." GDC also alleged that "the Navy awarded the subject Contract −2100 to General Dynamics' wholly-owned subsidiary, Electric Boat Corporation." In its Answer, filed on April 29, 1999, defendant admitted that GDC performs government contracts through wholly-owned subsidiaries, and that Contract −2100 was awarded to EBC; but defendant denied that it treats GDC as a single entity for government contracting purposes. In a joint preliminary status report to the court, dated June 8, 1999, the Government stated its position that the court lacks jurisdiction over this lawsuit (Case No. 99–45C) because GDC is not a party to Con-

tract –2100 and, therefore, is not a "contractor" within the meaning of the Contract Disputes Act, 41 U.S.C. Sec. 601(4), 605(a) and 609(a)(1) (1994). In subsequent status conferences held at the court on June 24, and July 27, 1999, the Government amplified its jurisdictional challenge, asserting that GDC is not a proper plaintiff because EBC, not GDC, is the "contractor."

While protesting that GDC was indeed the proper plaintiff, EBC, in an effort to move the proceedings forward, submitted a separate claim under the Contract Disputes Act on August 5, 1999. The claim was sent in the form of a letter from EBC's Vice President— Finance, John V. Leonard, Jr., to the deputy administrative contracting officer (DACO) in Groton, Connecticut, Mr. Frederic Roever, who was responsible for the administration of Navy contracts with EBC. In a footnote Mr. Leonard indicated that "Electric Boat is filing this claim in order to remove the jurisdictional issue as an impediment to addressing the substantive *Winstar* issues in the case."

On August 20, 1999 Mr. Roever forwarded the EBC claim to the CACO at GDC headquarters in Falls Church, Virginia, Charles Davis (successor to Raymond Eichman). In an accompanying memorandum Mr. Roever stated that "[i]n the division of contract administration responsibilities [between the CACO at GDC's headquarters and the DACOs at GDC's operating units, pursuant to a Memorandum of Agreement dated April/May 1997] .... the function of Executive Compensation was assigned to the CACO. Therefore .... I am forwarding [the Leonard letter] to you .... for appropriate action."

By letter dated August 25, 1999, the CACO wrote back to Mr. Leonard, stating that:

> "I am the cognizant contracting officer with authority .... to issue a final decision in connection with this claim.

> However, in light of the pending litigation in *General Dynamics Corp. v. United States*, No. 99–45C (Fed.Cl.), I am precluded by 28 U.S.C. Sec. 516 from issuing a final decision upon this claim. Accordingly, I am returning the claim to you without action."

(28 U.S.C. Sec. 516 provides that "[e]xcept as otherwise authorized by law, the conduct of litigation in which the United States .... is interested .... is reserved to officers of the Department of Justice, under the direction of the Attorney General.")

No final decision was issued on EBC's claim by either the CACO or the DACO. Accordingly, on October 7, 1999, immediately following the 60–day time period prescribed in the Contract Disputes Act for a final decision by the contracting officer, 41 U.S.C. Sec. 605(c)(5), EBC filed a complaint in this court (No. 99–865C). EBC characterized its complaint as "a timely appeal of the designated Administrative Contracting Officer's deemed denial of Electric Boat's claim."

GDC then filed an Amended Complaint in case No. 99–45C, dated October 8, 1999, alleging that Contract –2100 was awarded not to GDC's subsidiary, EBC, but to "General Dynamics Corporation, Electric Boat Division." Defendant answered by denying that Contract –2100 was awarded to "General Dynamics Corporation, Electric Boat Division" and affirming that the contract was awarded to EBC. Defendant also denied that *GDC* performs government contracts "through various wholly owned subsidiaries," but admitted that "*wholly owned subsidiaries* of [GDC], such as the Electric Boat Corporation," perform such contracts. (Emphasis added.)

Following another status conference on November 4, 1999, the cases of GDC and EBC were consolidated by judicial order on November 5, 1999. Oral argument was held on June 14, 2000.

## DISCUSSION

The questions presented by these cases are basically twofold:

I. Which corporate entity—GDC or EBC— is the contractor? Does the court have jurisdiction over either or both of these plaintiffs?

II. Did the enactment and implementation of the statutory cap on allowable senior executive compensation costs constitute

a breach of Contract –2100? [3]

## I. *Identity of the Contractor / Jurisdiction*

Plaintiffs assert that the first page of Contract –2100 clearly identifies "General Dynamics Corporation" as the "contractor," and that this designation has never been changed by contract modification or otherwise. This fact establishes the court's jurisdiction over the instant claim of GDC under the Contract Disputes Act (on appeal from the contracting officer's final decision). Moreover, plaintiffs argue that the Government has consistently treated GDC and its subsidiaries as a single entity for government-contracting purposes. In the alternative, plaintiffs contend that if the court concludes it does not have jurisdiction over the GDC case because GDC is not the contractor, then it has jurisdiction over the EBC case because of the Government's judicial admissions (in its answers to GDC's amended complaint and EBC's complaint, the status conference of June 24, 1999, its briefs on the jurisdictional issue, and at oral argument) that EBC is the contractor. Accordingly, plaintiffs argue that the court has jurisdiction over one case (No. 99–45C) or the other (99–865C), and should not dismiss both of them.

The Government argues that both claims must be dismissed by the court for lack of jurisdiction. This argument is based on the contention that EBC, not GDC, is the party with whom NAVSEA entered into Contract – 2100. If GDC is not in privity of contract with the Navy (*i.e.*, not the contractor in Contract –2100), then it has no legal grounds on which "to maintain a suit as a contractor against the government under the [CDA, 41 U.S.C. Sec. 609]." *Thomas Funding Corp. v. United States,* 15 Cl.Ct. 495, 501 (1988). Until GDC's present lawsuit is dismissed by the court, however, the Government argues that EBC is also precluded from pursuing any legal remedies by 28 U.S.C. Sec. 516 (1994), which reserves "the conduct of litigation in which the United States .... is interested .... to officers of the Department of Justice, under the direction of the Attorney General." This means that the Navy contracting officer had no authority to issue a final decision on EBC's administrative claim for breach of contract, since the matter was already in litigation and thus within the exclusive province of the Department of Justice. See *Sharman Co., Inc. v. United States,* 2 F.3d 1564, 1571 (Fed.Cir.1993). Accordingly, the lack of a final decision on EBC's claim from the contracting officer within 60 days would not constitute a "deemed denial" conferring jurisdiction on this court under 41 U.S.C. Sec. 605(c)(5). In sum, the Government maintains that the GDC and EBC claims must both be dismissed, after which EBC, as the contractor, can institute a brand new action under the CDA by filing another administrative claim with the contracting officer.[4]

---

3. There is some difference of opinion between the plaintiffs and the Government as to whether the identity of the claimant would make any difference with respect to the amount of potential damages resulting from the Sec. 808 compensation cap. The parties' jurisdictional dispute does not appear to be motivated by this question, however, since plaintiffs assert unequivocally that damages would be identical whether GDC or EBC is the claimant and the Government speculates that EBC, which the Government insists is the contractor, may be entitled to greater damages than GDC would be should the court find a breach of contract. The only mutually recognized difference with regard to the Government's potential liability, depending on the claimant, is the amount of interest that would be calculated on an award under the CDA, 41 U.S.C. Sec. 611. Since interest is calculated from the date the claim was filed with the contracting officer until the date of judgment, the ten months separating the filings of the administrative claims by GDC and EBC would obviously lead to less interest on any award if EBC is found to be the proper plaintiff. If both claims are dismissed as the Government is seeking, however, this entire action would have to be filed anew (presumably by EBC). That would establish a later date for the calculation of interest, making it difficult to predict (considering the uncertain duration of new litigation) whether the interest accruing on any award would be greater or less than amounts accruing on the claims currently before the court.

4. Plaintiffs have expressed the concern that if EBC were to return to court at a later time with a contracting officer's final decision, the Government, notwithstanding its present insistence that EBC is the contractor and the proper party to seek relief under the CDA, might well challenge EBC's status as a viable plaintiff by arguing that the contract instrument does not identify EBC, but rather GDC, as the contractor. In the

### Which Corporation is the Contractor?

 To determine which corporation—GDC or EBC—is the contractor entitled to institute an action in this court, we must look first to the language of the contract instrument. If the provisions of a contract are clear and unambiguous, a court will give them their plain and ordinary meaning and will not resort to parol evidence. *Wright Runstad Properties Ltd. Partnership v. United States,* 40 Fed.Cl. 820, 824 (1998). If the contract language can be interpreted in two different and reasonable ways, however, then it is ambiguous and factors outside the contractual terms can be taken into account to aid the court in interpreting the instrument. In a case of ambiguity, the court can look at all the relevant circumstances surrounding the transaction to discover the parties' underlying intention, including the conduct of the parties before the advent of the controversy, oral statements, writings, and other conduct by which the parties manifested their assent. *KMS Fusion, Inc. v. United States,* 36 Fed.Cl. 68, 76–77 (1996).

### Plaintiffs' Case

With respect to Contract –2100, plaintiffs argue that the language of the contract instruments clearly and unambiguously identifies GDC as the contractor. "General Dynamics Corporation" is identified as the "contractor" in the appropriate space on page 1 of the letter contract (Box 7: Name and Address of Contractor). "Electric Boat Corporation" does not appear in that box. The fact that "Electric Boat Division" is appended to the designation "General Dynamics Corporation" is legally inconsequential because an unincorporated division does not have a legal status independent of the corporation. "A division of a corporation is not a separate entity but is the corporation itself." *In re Sugar Industry Antitrust Litigation,* 579 F.2d 13, 18 (3d Cir.1978); accord, *Western Beef, Inc. v. Compton Investment Co.,* 611 F.2d 587, 591 (5th Cir.1980). Thus, the appearance of "Electric Boat Division" and

its Groton, Connecticut address (where the contract was to be performed) on the letter contract added nothing to the only designation in the box for "Name and Address of Contractor" with legal import—"General Dynamics Corporation." The contract definitization in May 1996 contained exactly the same entry for "Name and Address of Contractor," thus confirming GDC's status as the contractor. Moreover, the contract was never amended by modification or otherwise to change the name of the contractor from GDC to EBC. So General Dynamics Corporation remains the contractor of record to this day.

Notwithstanding their position that the identity of the contractor is clearly established on the face of the contract, plaintiffs also refer to extrinsic evidence in support of their view that GDC is the contractor. Plaintiffs contend that the Government has consistently treated General Dynamics Corporation and its wholly-owned subsidiaries as a single entity for contracting purposes. According to Paul W. Steckley, GDC's Staff Vice President for Internal Audit (Steckley affidavit at 1), there was:

> "a tacit agreement and long-standing practice between General Dynamics and the Government under which the Government treats General Dynamics and its several subsidiaries and divisions, including Electric Boat Corporation, as a single entity and as a *unified business enterprise.*"

As evidence thereof plaintiffs cite, among other things, the Memorandum of Agreement between the Defense Department and GDC ("General Dynamics CACO / DACO Agreement") which specifies the respective responsibilities of the CACO at GDC headquarters and the DACOs assigned to GDC's business units and subsidiaries in the administration of contracts. Pursuant to this agreement the Government assigns several contracting officers and auditors to GDC's corporate headquarters to carry out administrative functions pertaining to GDC as a whole as well as

court's opinion, the Government would be hard pressed to make such a case in view of its repeated assertions during the course of the instant litigation that EBC is the contractor in Contract –2100 and, as such, would be entitled to

seek relief in this court after the dismissal of the instant actions, the filing of a new administrative claim by EBC, and the denial of that claim by the contracting officer.

to individual wholly-owned subsidiaries. Among the tasks performed from GDC headquarters are the government audits of corporate-wide executive compensation costs.

When GDC filed its administrative claim under the Contract Disputes Act in 1998, alleging breach of Contract –2100 with respect to allowable senior executive compensation costs, the CACO at GDC headquarters considered the claim on the merits and issued a final decision denying it without raising any question as to whether GDC was the proper claimant. Indeed, in his final decision the CACO stated that the "Executive Compensation Cap applies to .... all of GD[C]'s covered contracts, including the referenced contract awarded to EB[C]." Thus, the CACO identified the EBC contract (Contract –2100) as a *GDC-covered contract.* Similarly, when EBC filed its administrative claim in 1999 with the DACO at Groton, Connecticut, the DACO conveyed the claim to the CACO because it fell within the latter's functional responsibility. In his subsequent letter to EBC the CACO stated that "I am the cognizant contracting officer with authority, pursuant to FAR subparts 1.6 and 42.6, to issue a final decision in connection with this claim." Thus, the CACO at GDC headquarters asserted jurisdiction over the claim filed by the parent, GDC, as well as that filed by its subsidiary, EBC, thereby confirming his previous statement that the EBC contract was one of *GDC's* contracts. In essence, plaintiffs assert that both the Government and GDC recognized the Electric Boat facility as the performing entity in Contract –2100, but GDC as the ultimately responsible contractor.

An unrelated CDA claim instituted by GDC in 1997—based on three government contracts held by GDC's wholly-owned subsidiary, Land Systems, Inc.—offers additional evidence of GDC's "single entity" treatment by the Government. Land Systems, Inc., like EBC, is a corporate subsidiary of GDC. The 1997 claim, filed in the name of General Dynamics Corporation, sought the payment of moneys due under the Land Systems contracts which had been withheld by the Government to pay an alleged debt of GDC (arising from a tax refund to GDC from the State of California). The contracting officer (CACO) did not contend that GDC was not the contractor or that the administrative claim should have been filed by Land Systems, Inc. Following a deemed denial of the administrative claim, GDC appealed to the Armed Services Board of Contract Appeals (ASBCA No. 51045), which also raised no jurisdictional question before the claim was settled. Thus, as in the GDC and EBC claims at issue here, the cognizant contracting officer (as well as the ASBCA) in that earlier claim treated GDC as the contractor for purposes of the Contract Disputes Act, even though the subject contracts were held by a GDC subsidiary.

During the above-described litigation (involving Land Systems, Inc.) before the ASBCA, GDC took the deposition of the staff accountant at the Defense Finance and Accounting Service (DFAS) responsible for the collection of amounts allegedly due the Government from GDC. This official testified that the Government's practice was to collect money owed by GDC from any one of its subsidiaries or business units. In that case the $8.945 million allegedly owed by GDC was withheld from three invoices submitted to the Government by Land Systems, Inc. The DFAS official, Emma J. Carter, testified that the Government had first tried to collect the money from Electric Boat Corporation, but was unable to do so due to administrative complications. As she explained in her deposition (Deposition of Emma J. Carter at 113 and 173):

> "I was trying to take the offset against any General Dynamics Corporation. It didn't have to be Electric Boat."

> \* \* \* \* \* \*

> "General Dynamics is a very large corporation..... I was identifying some cage codes where there may be some invoices to offset for that amount..... It could have been from any General Dynamics contract."

There is no evidence that GDC's objection to the Government's action had anything to do with the fact that a subsidiary (as opposed to the parent) was targeted for the withholding.

As further evidence of the Government's treatment of GDC and its subsidiaries as a single entity for contracting purposes, GDC points to the 38 modifications of Contract – 2100 issued between March 1996 and June 1999 by the NAVSEA procuring contracting officer in Arlington, Virginia. Only four of the modifications identified the contractor as simply "Electric Boat Corporation." These were issued in March and May 1996, December 1997 and April 1998. Twenty-two modifications were issued between the spring of 1996 and September 1998 in the name of "General Dynamics Corporation, Electric Boat Division." Twelve modifications were issued in the name of "Electric Boat Corporation, a General Dynamics Company"—the first in February 1997, the next three in December 1997, and the last eight between September 1998 and June 1999. According to the plaintiffs "[t]his almost random issuance of contract modifications to one entity or the other demonstrates that the Government is completely indifferent as to the precise corporate designations and treats all of General Dynamics and Electric Boat as a single integrated enterprise." (Plaintiffs' Motion for Order Finding Jurisdiction at 10–11.)

Plaintiffs acknowledge that payments for work performed on Contract –2100 are made to EBC, not GDC. According to GDC Vice President Paul Steckley, however, the payments in practical effect go directly to GDC. Government payments on contracts performed by GDC subsidiaries are deposited into "bank accounts listed in the name of the subsidiary but owned by General Dynamics." GDC transfers "substantially all" of these funds into a central account daily. So payments on Contract –2100 accrue directly to the benefit of GDC. In addition, GDC covers all of the costs incurred by EBC in performing the contract, since EBC commands no separate funds to pay for its own expenses. (Steckley affidavit at 4.)

### Government's Case

Defendant argues that Contract –2100 is ambiguous on its face as to the identity of the party with whom the Government entered into the contract. The letter contract of January 1996, while identifying the contractor in Box 7 as "General Dynamics Corporation Electric Boat Division," was signed by "John K Welch, President & CEO." Mr. Welch was President & CEO of EBC, not GDC (where he was only a Vice President), which suggests to the Government that Welch was purporting to act on behalf of EBC in signing the contract. The same ambiguity, defendant argues, appears in the contract definitization of May 1996. There the contractor is likewise identified as "General Dynamics Corporation Electric Boat Division," but the document is signed by an officer of EBC, Vice President John V. Leonard, Jr. (Defendant neglects to mention, however, that according to GDC corporate policy Mr. Welch was acting "on behalf of GDC" and with GDC's express permission.)

The Government points out a couple of provisions in these two contract instruments which in its view cast further uncertainty on GDC's claim to be the contractor. Thus, the letter contract (page 42) contains a definition stating that "DESIGN YARD—means *Electric Boat Corporation (EB)* (emphasis in the original) in its capacity as Design Yard, not in its capacity as *shipbuilding contractor* (emphasis added)." In addition, the contract definitization (page 6) contains a clause under "H–8 Special Provision Concerning Divested Division Costs" with the words "[t]he *contractor's parent company, General Dynamics Corporation* (emphasis added)." (These references to EBC as the "shipbuilding contractor" and GDC as "the contractor's parent company," however, do not detract from the distinction, previously discussed, that EBC is the performing entity while GDC, which provides the funding and covers the costs in Contract –2100, is the ultimately responsible contractor.) As for the myriad contract modifications issued in subsequent years, the Government acknowledges that many of the "P" modifications were in the name of "General Dynamics Corporation Electric Boat Division," but points out that they were executed by EBC officials without any indication that they were acting on behalf of GDC. In addition, the remaining "P" modifications, as well as all of the "A" modifications, were issued in the name of EBC and signed by EBC officials. (Under GDC corporate poli-

cy, however, EBC officials *were* acting "on behalf of GDC.")

In further support of its assertion that the designation of GDC as the contractor in documents pertaining to Contract –2100 is a mistake, the Government has submitted a declaration dated November 9, 1999 from the NAVSEA procuring contracting officer, Stephen J. Filan. Mr. Filan issued the solicitation for Contract –2100, was a member of the contract negotiation team, and signed the final contract and subsequent modifications on behalf of NAVSEA. Mr. Filan asserts that "General Dynamics Corporation Electric Boat Division" was incorrectly identified as the contractor in the letter contract of January 1996 and the contract definitization of May 1996, as well as in 22 contract modifications between March 1996 and September 1998. Mr. Filan states that he intended to award the contract and issue all subsequent modifications to Electric Boat Corporation, not General Dynamics Corporation. According to Mr. Filan, all of the corporate representatives with whom he and the other NAVSEA team members negotiated the letter contract and definitization were officials of Electric Boat Corporation, and none of them purported to be acting on behalf of GDC.

By itself the Filan declaration, since it postdated the commencement of the instant litigation, would be of minimal evidentiary weight. "Only the action of the parties *before a controversy arises* is highly relevant in determining what the parties intended." *Dynamics Corp. v. United States,* 182 Ct.Cl. 62, 389 F.2d 424, 430 (1968), quoting *Northbridge Electronics, Inc. v. United States,* 175 Ct.Cl. 426, 438, 1966 WL 8866 (1966) (emphasis added). Filan does cite some documentation in the record that meets this temporal requirement, and which he maintains supports the view that the Navy intended to contract with EBC. For example, in an internal Navy document dated January 6, 1996 Filan requested approval from NAVSEA's Deputy Commander for Contracts (granted on January 16, 1996) "to enter into an undefinitized contract action (UCA) in the form of a letter contract (N00024–96–C–2100) with *Electric Boat Corporation* . . . ." (emphasis added). (The letter contract that followed, however, was in actuality with GDC, Electric Boat Division.) Also, on May 1, 1996, *EBC*'s Director of Contracts and Estimating, D.R. Banks, executed a "Certificate of Current Cost or Pricing Data" in support of Contract –2100 on behalf of *Electric Boat Corporation.* (This document cannot obscure the fact, however, that all contract costs were ultimately paid by GDC.)

As for the modifications to Contract –2100 in succeeding years, Filan points out that most of the 38 modifications issued by the NAVSEA procuring contracting officer in Arlington, Virginia (Mr. Filan), were signed on behalf of the contractor by senior officers of EBC. (A number were issued unilaterally by NAVSEA and bore no contractor signature.) As for the more than 200 modifications issued by the administrative contracting officer in Groton, Connecticut, virtually all were signed on behalf of the contractor by EBC officials. (A few of these were also issued unilaterally by the Navy and bore no contractor signature.) None of the modifications, whether from Arlington or from Groton, were signed by GDC representatives. (Once again, though, the Government's emphasis on EBC officials' involvement in the contract negotiation and modification process does not alter the fundamental relationship among the parties—*i.e.,* that EBC is the performing entity, but that GDC, which pays the bills and is responsible for the contract's completion, is the ultimately responsible contractor.)

As further evidence that EBC, not GDC, was the intended contractor, the Government cites the Novation Agreement executed by GDC, EBC and the United States in December 1995 and the Guaranty Agreement executed by GDC and delivered to the Government in January 1996. The Novation Agreement, as previously discussed, acknowledged the transfer by GDC of all the assets of the former Electric Boat Division, including 321 government contracts, to EBC and recognized EBC as GDC's successor in interest to the contracts. The Agreement does not cover Contract –2100, however, since it only applied to contracts in existence on December 11, 1995. Nevertheless,

the Government argues that the intent of the parties to the Novation Agreement was to invest the newly-formed EBC with all future shipbuilding activities since EBC, not GDC, was the only entity capable of performing such contracts. Moreover, in the Guaranty Agreement executed one week before the award of Contract –2100, GDC specifically requested the Government to award contracts to *EBC* and guaranteed the performance by EBC of any such contracts awarded in 1996. This Agreement, in the Government's view, contradicts plaintiffs' assertion that GDC, rather than EBC, was the Navy's intended contracting partner in Contract –2100. (Together, however, the Novation and Guaranty Agreements serve merely to confirm that EBC was the performing entity while GDC was the party looked to by the Government as the ultimately responsible contractor.)

Finally, the Government cites the letters from GDC and EBC senior executives to the Navy, initiating their respective administrative claims under the Contract Disputes Act, as acknowledging that *EBC* is the contractor in Contract –2100. Thus, in his letter dated October 5, 1998, GDC's Senior Vice President—Law, David A. Savner, wrote that "[a]s a test case, General Dynamics has selected a contract between the Government and Electric Boat Corporation." (As previously noted, though, Mr. Savner also certified this claim "on behalf of General Dynamics.") In the subsequent letter of EBC's Vice President—Finance, John V. Leonard, Jr., dated August 5, 1999, reference is made to "contract number N00024–96–C–2100, which the Department of the Navy awarded to Electric Boat ...." (It should be borne in mind, however, that this letter was written only after the Government raised its jurisdictional objection to GDC's claim and only for the purpose of initiating EBC's protective action in this court.)

Based on this documentary evidence and all the circumstances surrounding the award of Contract –2100, the Government argues that the intended contractor was EBC, not GDC. The identification of GDC as the contractor in various contract documents, therefore, was allegedly a mistake. The

Government contends that the court "should disregard that drafting error and construe the contract as one between the Government and EBC, in accordance with the parties' intent, as opposed to what they wrote." (Def. Opp. to Pl. Mot. for Order Find. Juris. at 30.)

■ What the Government is seeking, in effect, is a reformation of the subject contract. Reformation is a contract remedy which courts may grant in order to conform the parties' written agreement with their antecedent intent, that is, with the agreement that actually was reached. Thus, reformation, for the most part, is concerned with mistakes in expression, as in the case of the omission of an agreed-upon term, or the inclusion of a term not agreed upon or the incorrect reduction of a term to writing. E. Allan Farnsworth, *Contracts*, Sec. 7.5 at 468 (1982); see also *American Telephone and Telegraph Co. v. United States*, 32 Fed.Cl. 672, 681 (1995). As further explained by Arthur L. Corbin, "One who files a bill for reformation of a contract usually asserts that the written words do not express to others the meaning that he was trying to express; that he fully expressed that meaning outside the four corners of the document; and that the other party understood him, knew that meaning, and assented. He asks the court to interpret those extrinsic expressions and to make them legally effective. This is what the court does when it decrees reformation." 3 Arthur L. Corbin, *Corbin on Contracts*, Sec. 540 at 84–87 (1960 and Supp.1992); see also *George Hyman Construction Co. v. United States*, 30 Fed.Cl. 170, 174 (1993). As will be discussed, *infra*, the facts of this case do not warrant the reformation of Contract –2100.

### *Conclusion: GDC is the Contractor*

■ After careful consideration of all the foregoing evidence, the court concludes that the Navy's contracting partner in Contract –2100 is General Dynamics Corporation. The cardinal facts are: (1) the Navy made the contract offer to *GDC* (Electric Boat Division), (2) the company authorized the contract to be negotiated "on behalf of [*GDC*]," and (3) the contract instruments (letter

award and definitization) identify *GDC*, not EBC, as the contractor. That designation has never been changed, despite the Government's assertion that it was a drafting error. The court recognizes that the actual entry on the contract documents was "General Dynamics Corporation, *Electric Boat Division*," which was partially in error insofar as the Electric Boat Division no longer existed. As previously noted, however, the unincorporated Electric Boat Division was not a legal entity separate and apart from its parent, GDC (*In re Sugar Antitrust Litigation, supra*). So the only entry with legal import in the "Name and Address of Contractor" box was "General Dynamics Corporation." The significance of the address that followed in the box was in identifying the Electric Boat design yard in Groton, Connecticut, as the GDC facility where the contract was to be performed.

If the Navy sincerely believed that GDC was not the contractor, it would surely have acted more quickly and with more conviction to correct the alleged "mistake" in the letter contract and insure that EBC was identified as the contractor in all subsequent documentation. Errors like this, if viewed as significant, are cured by official contract modifications. They should not be allowed to serve as a spawning ground for future litigation at the whim of one party. In this case, the Government's claim of "drafting error" in January 1996 is unpersuasive in view of the fact that this same "error" was made in the definitization of the contract in May 1996 and in no less than 22 contract modifications up to September 1998. During this time the identity of the contractor was not an issue, but there was no question that the Government looked to GDC to ensure the funding and completion of the contract. Only after the instant litigation began in this court, three years after the contract was executed, did the Government adopt the unequivocal stance that EBC, rather than GDC, was the contractor. To this very day, however, there is no evidence that the Navy has made any effort to amend the contract documents to identify EBC, rather than GDC, as the contractor. Thus, the Government's conduct cannot be reconciled with its contention that EBC was the intended contractor all along (see *Northbridge Electronics, supra*).

In the court's view, the Navy's conduct with respect to Contract –2100 accords fully with plaintiffs' assertion that the Government, per "tacit agreement and longstanding practice" with GDC, "treats General Dynamics and its several subsidiaries and divisions, including Electric Boat Corporation, as a single entity and as a unified business enterprise" for contracting purposes (Steckley affidavit at 1–2). Lending further credence to this "one entity" contracting practice are (a) the statements by the contracting officer assigned to GDC headquarters in 1999 that Contract –2100 was a "GD[C] covered contract" and that he had decisional authority over the CDA administrative claims of both GDC and EBC, (b) the Government's acknowledgement of GDC as the "contractor" in the unrelated CDA claim in 1997–98 involving contracts performed by another GDC subsidiary, Land Services, Inc., and (c) the Government's practice, evident in that prior CDA claim, of collecting moneys owed by GDC out of the contract balances of any of the company's subsidiaries or business units.

The Government had an established working relationship with GDC and its Electric Boat Division that long predated the creation of EBC. It is clear that all contracts involving the former Electric Boat Division (EBD) were executed in the name of GDC, since EBD was not a legal entity capable of entering a contract. EBD was GDC's performing arm in contracts for the construction of naval ships, but GDC was the contractor. The record indicates that this relationship continued unchanged in Contract –2100, notwithstanding the fact that the new corporate entity, EBC, had replaced EBD. The entry for "name of contractor"—in both the letter contract and the definitization—was not Electric Boat Corporation, but General Dynamics Corporation. Below that was entered the name of GDC's traditional performing arm—Electric Boat Division—and its address (Groton, CT). What this demonstrates to the court is that the Navy did not intend in Contract –2100 to change its established pattern of dealing with GDC. It continued to regard GDC as its contracting partner, and

the Electric Boat facility in Groton, Connecticut, as the performing entity. That the Navy dealt exclusively with EBC officials in negotiating and later modifying the contract is of little consequence, in the court's view, since prior shipbuilding contracts were presumably negotiated and modified in a like manner with representatives of EBD. As previously discussed, GDC subsidiaries *and* divisions had authority to negotiate contracts "on behalf of the Company" (*GDC*), subject to approval from the GDC home office for contracts over certain threshold amounts.

The Novation and Guaranty Agreements are cited by defendant as evidence that both the Government and GDC intended to transfer all Navy shipbuilding activities and contracts from GDC's Electric Boat Division to EBC. But the Novation Agreement applied only to pre–1996 contracts, and though the Guaranty Agreement requested that the Government award additional contracts to EBC in 1996, the contract awarded on January 29, 1996 (Contract –2100) was not in the name of EBC, but rather *GDC* (Electric Boat Division). If the Navy's intention pursuant to the Guaranty Agreement was to contract strictly with EBC—*i.e.,* to the exclusion of GDC—it is inexplicable how it could issue a contract one week later in the name of GDC. The Navy's conduct, both in the immediate aftermath of the Guaranty Agreement and in succeeding years, contradicts its belated assertion that it did not regard GDC as its contracting partner in Contract –2100. What the Guaranty Agreement indicates to this court is that the Navy wanted to make sure that GDC, which would continue to provide the funds for and reap the payments on all future contracts performed by EBC, remained ultimately liable for the performance of contracts by its Electric Boat subsidiary. In short, the designation of "General Dynamics Corporation" as the "contractor" in the letter contract and the subsequent definitization is persuasive evidence that the Navy still considered GDC to be its contracting partner.

■ For the foregoing reasons, the court finds no grounds for contract reformation in

this case. The evidence of record does not corroborate the Government's assertion that the designation of GDC as the "contractor" in the letter contract and definitization was a mistake. To the contrary, the Navy's conduct then and in succeeding years under Contract –2100 manifested the intent to continue dealing with GDC and its Electric Boat facility as it had in the past—with GDC as its contracting partner and the Electric Boat facility as GDC's performing entity. The Navy's conduct was in accord with, not in conflict with, the terms of the contract that listed the contractor as "General Dynamics Corporation, Electric Boat Division." Accordingly, there is no basis to conclude that the parties had a different antecedent intent than that expressed in the written agreement. Contract reformation, therefore, is not in order.

### GDC is the Real Party in Interest

■ Quite apart from the foregoing discussion, GDC is the real party in interest in this litigation. Rule 17(a) of the Court of Federal Claims provides that: "Every action shall be prosecuted in the name of the real party in interest." RCFC 17(a). The rule does not define real party in interest, but there is ample legal authority on this subject. "Real parties in interest are the persons or entities possessing the right or interest to be enforced through the litigation." *Moore's Federal Practice*, 3d ed., Vol. 4, Sec. 17.10[I]. See *Cinema North Corporation v. Plaza at Latham Associates*, 867 F.2d 135, 139 (2d Cir.1989), in which the court held that the guarantor on a proposed lease agreement who had the legal right to enforce the lease agreement was a real party in interest under Rule 17(a) of the Federal Rules of Civil Procedure, FRCP 17(a).[5] "A real party in interest is one who has a real, actual, material, or substantial interest in the subject matter of the action." 59 Am.Jur.2d, Sec. 36 at 431. "Real party in interest status requires that the plaintiff have a present and substantial interest in the relief sought." *Id.* See *H.F. Allen Orchards, et al. v. United States*, 749 F.2d 1571, 1576 (Fed.Cir.1984), in which

---

5. Rule 17(a) of the Federal Rules of Civil Procedure, FRCP 17(a), is identical in all material respects with Rule 17(a) of the Court of Federal Claims, RCFC 17(a).

the court held that farmers who were the owners of water supplied from a federal irrigation project, and who were beneficiaries of the project, were the real parties in interest (with standing to sue the Government for an alleged breach of contract) under RCFC 17(a), not the local irrigation district which was acting as a surrogate for the farmers in contracting with the relevant federal agency.

■ Contract –2100, at issue in this litigation, is a cost-type contract under which GDC covers all of the incurred performance costs. Moreover, all payments from the Government pass through EBC to GDC, and GDC is ultimately liable for the contract's performance. So GDC has substantial legal and pecuniary interests in the contract—it bears responsibility if the contract is not properly performed and it will reap the profit or bear the loss on the contract. Consequently, GDC is materially affected by any diminution of allowable executive compensation costs to which it is entitled under Contract –2100 and it has a substantial interest in the relief sought in this litigation. GDC, therefore, is the real party in interest in this action. Accordingly, filing the initial complaint (No. 99–45C) in the name of GDC was procedurally sound under RCFC 17(a). The complaint later filed by EBC (No. 99–865C) is superfluous.

For the purpose of this litigation, therefore, the court determines that the real party in interest and proper plaintiff is General Dynamics Corporation.[6]

## *The Court has Jurisdiction of GDC's Claim*

Having determined that General Dynamics Corporation is the contractor and real party in interest in Contract –2100, the court finds that it has jurisdiction under the Contract Disputes Act of GDC's instant claim (No. 99–45C), which was duly filed in this court under 41 U.S.C. Sec. 609(a) following the contracting officer's final decision denying GDC's administrative claim. The later-filed protective claim of EBC (No. 99–865C)—identical to the GDC claim in every respect—was filed as an alternative, not an addition, to the GDC claim for the express and sole purpose of overcoming the jurisdictional challenge raised by the Government. Its purpose is rendered moot by the court's finding of juris-

6. Even if the court were to find, arguendo, that EBC was the intended contractor in Contract – 2100, that would not necessitate the dismissal of both pending claims, as advocated by the Government. RCFC 17(a) provides that: "No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed .... for .... joinder or substitution of, the real party in interest; [which] shall have the same effect as if the action had been commenced in the name of the real party in interest." If EBC were found to be the contractor, therefore, the court could allow EBC to be substituted for GDC as the plaintiff in the initial complaint (No. 99–45C). See *Link Aviation, Inc., et al. v. Wilford W. Downs, et al.*, 325 F.2d 613 (D.C.Cir.1963) and *American Fidelity & Casualty Co. v. All American Bus Lines*, 190 F.2d 234 (10th Cir.1951). Substitution of EBC as the real party in interest would satisfy, under the special circumstances of this case, the CDA requirement that the plaintiff be the contractor, 41 U.S.C. Sec. 609(a)(1).

The court finds no merit to the Government's argument that EBC would not be a valid plaintiff under the Contract Disputes Act because it has not obtained a final decision from the contracting officer on its administrative claim, as required under 41 U.S.C. Sec. 605. Since Rule 17(a) provides that substitution has "the same effect as if the action had been commenced in the name of the real party in interest," EBC would stand in the shoes of the original plaintiff, GDC, in Claim No. 99–45C. GDC had already filed an administrative claim, as required by the CDA, and received a final decision thereon before filing its complaint. In denying the claim, the contracting officer stated that "the Executive Compensation Cap applies to .... all of [G]DC's covered contracts, including the referenced contract awarded to EB[C]," and that he did "not have the authority to waive statutorily imposed requirements." Were EBC to go through the motions of refiling an administrative claim in its own name, it would get exactly the same denial and rationale from the contracting officer. Indeed, the CO's language in the GDC decision specifically embraces any claim based on the subject legislation that might be filed separately by EBC. In other words, filing a new administrative claim in the name of EBC would be a futile and pointless act. Accordingly, in the hypothetical event that EBC were found to be the contractor and substituted under RCFC 17(a) as the plaintiff in Claim No. 99–45C, the court views the administrative claim filed by its parent, GDC, on which a final decision was issued by the contracting officer, as fulfilling the spirit and intent of the CDA for the purposes of satisfying the jurisdictional requirement of 41 U.S.C. Sec. 605.

diction with respect to GDC. Accordingly, the complaint of Electric Boat Corporation (No. 99–865C) can be dismissed, without prejudice.

Hereinafter, the use of the term "plaintiff" applies exclusively to GDC.

It is worth pointing out that the court's finding of jurisdiction with respect to GDC's complaint works no hardship or disadvantage on either plaintiffs or defendant. As noted previously, neither side asserts that GDC would be entitled to a larger damages award than EBC. (Indeed, the plaintiffs have indicated that it makes no difference to them whether GDC or EBC is recognized as the proper plaintiff, as long as the court does not dismiss both claims.) The only mutually acknowledged difference with respect to a possible award is in the interest calculation under the Contract Disputes Act, but this difference is unlikely to be substantial considering the relatively small scale of the contract dispute at issue. (See Note 3, *supra.*) Furthermore, it would serve no useful purpose, and would fly in the face of judicial economy and rationality, for the court to dismiss both of the actions currently pending, especially since it is undisputed that a valid contract exists which has been the subject of an administrative claim and final decision by the contracting officer.

## II. *Liability—Was There a Breach of Contract?*

Plaintiff alleges that the enactment of Section 808 of the FY 98 Authorization Act (P.L. 105–85, 111 Stat. 1629), which applied a retroactive cap on senior executive compensation costs, breached Contract –2100 because the cap imposed by the Act—$340,650 for 1998 and $342,986 for 1999—is well below the executive compensation costs plaintiff incurred and regularly recovered prior to the Act, and but for the Act would have continued to receive under the applicable federal acquisition regulation, FAR 52.216–7—ALLOWABLE COST AND PAYMENT. This regulation was incorporated by reference into Contract –2100 and provided that payments were to be made by the Government to the contractor "in amounts determined to be allowable by the Contracting Officer in accordance with *subpart 31.2 of the Federal Acquisition Regulation* (FAR) *in effect on the date of this contract* and the terms of the contract." (Emphasis added.) With the implementation of Section 808, the contracting officer was no longer able to determine allowable amounts "in accordance with [FAR] subpart 31.2 .... in effect on" January 29, 1996, the date the letter contract was executed (or May 9, 1996, the date the contract was definitized).

The Government concedes that "under the cost standards prescribed by [FAR Subpart 31.2, effective in 1995–96] the allowable costs of GDC's five most highly compensated senior executives incurred in 1998 exceed the benchmark compensation amount for fiscal year 1998 established by the Administrator [for Public Procurement Policy] pursuant to the Section 808 Compensation Cap." (Defendant's Opposition to Plaintiff's Motion for Partial Summary Judgment at 13.) Accordingly, there is no dispute between the parties that the statutory compensation cap of the FY 98 Authorization Act reduced the amount of money GDC would have received from the Government for executive compensation costs in 1998. The Government argues that the cap does not constitute a breach of contract, however, "[b]ecause Contract –2100 does not contain an unmistakable promise that the Government will not exercise its sovereign authority to enact legislation that alters the extent to which senior executive compensation costs are allowed as indirect costs on Government contracts." *Id.* at 14.

In analyzing whether a particular exercise of sovereign authority breaches a contract between the government and a private party, two longstanding doctrines applicable to contracts with the sovereign come into play. One is the *sovereign acts doctrine,* which excuses the government from performing a contractual obligation if performance is rendered impossible by a public and general sovereign act. The doctrine originated in the Court of Claims during the 19th century and was first enunciated in *Jones v. United States,* 1 Ct.Cl. 383, 384, 1865 WL 1976 (1865), in which the court stated that "Whatever acts the government may do, be they legislative or executive, so long as they be public and general, cannot be deemed spe-

cially to alter, modify, obstruct or violate the particular contracts into which it enters with private persons." The doctrine was recognized by the Supreme Court in *Horowitz v. United States*, 267 U.S. 458, 461, 45 S.Ct. 344, 69 L.Ed. 736 (1925), which noted that "[i]t has long been held by the Court of Claims that the United States when sued as a contractor cannot be held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign." More recently, the Federal Circuit reiterated this principle in similar language: "Under the sovereign act doctrine, the United States as contractor will not be held responsible for the acts of the United States as sovereign." *Hughes Communications Galaxy, Inc. v. United States*, 998 F.2d 953, 958 (Fed.Cir.1993).

■■■ The other pertinent doctrine bearing on contracts between the government and a private party is the *unmistakability doctrine*, which also had its genesis in the 19th century. In a line of cases extending back to the 1830s the Supreme Court has repeatedly held that a government will not be deemed in a contract to surrender a sovereign power unless it does so unmistakably. As expressed in *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 148, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982), and *Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41, 52, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986), "sovereign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms." The Supreme Court recently synthesized its view of the unmistakability doctrine in *United States v. Winstar Corporation, et al.*, 518 U.S. 839, 878, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), stating that the "collective holding [of 19th and 20th century cases] is that a contract with a sovereign government will not be read to include an unstated term exempting the other contracting party from the application of a subsequent sovereign act (including an Act of Congress), nor will an ambiguous term of a grant or contract be construed as a conveyance or surrender of sovereign power."

The application of these two doctrines by federal courts has not always been clear and consistent over the years. Judicial opinions have varied—some focusing on the sovereign acts doctrine, others on the unmistakability doctrine—without always explaining the interplay, if any, of the two. What has failed to emerge from federal jurisprudence thus far is a consistent approach that encompasses both doctrines in an integrated legal analysis.

### Supreme Court's opinion in Winstar

In its Motion for Partial Summary Judgment, plaintiff alleged that the retroactive application of the statutory cap on allowable senior executive compensation costs imposed by the FY 98 Authorization Act constitutes a breach of Contract –2100 under the legal rationale set forth by the Supreme Court in *United States v. Winstar Corporation, et al.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). The *Winstar* case was an outgrowth of the savings and loan crisis of the 1980s, in which the Government encouraged healthy S & Ls to merge with failing S & Ls by granting the merged entities favorable accounting treatment under federal capitalization requirements. The contracts between the Government and the S & Ls—which allowed the thrifts to use "supervisory goodwill" to satisfy a portion of their minimum regulatory capital requirements—arose from acquisition agreements that incorporated resolutions and forbearance letters by federal regulators approving the mergers and promising specific favorable treatment of goodwill capital. Congress subsequently enacted the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), however, which ended this favorable accounting treatment by restricting the continued use of "supervisory goodwill" to help satisfy regulatory capital requirements. Three S & Ls (two of which were liquidated as a result of the changed accounting rules and the other of which had to be recapitalized) filed suit in the Court of Federal Claims, asserting that the Government was in breach of contract for unilaterally withdrawing the favorable accounting treatment. The Supreme Court, affirming lower court decisions by the Court of Federal Claims (*Winstar Corp., et al. v.*

*United States,* 21 Cl.Ct. 112 (1990) and 25 Cl.Ct. 541 (1992)) and the Court of Appeals for the Federal Circuit (*Winstar Corp., et al. v. United States,* 64 F.3d 1531 (1995) *en banc* ), held that the Government by enacting FIRREA had breached its contractual obligations to the plaintiff S & Ls.

The Supreme Court's vote in favor of the plaintiff S & Ls was 7–2. The justices differed in their reasoning, however, and did not issue a majority opinion. The four-judge plurality opinion, authored by Justice Souter (joined by Justices Stevens, O'Connor, and Breyer), held that:

> "When the law as to capital requirements changed, the Government was unable to perform its promises and became liable for breach .... applying ordinary principles of contract construction and breach that would be applicable to any contract action between private parties."

*Winstar,* 518 U.S. at 870–71, 116 S.Ct. 2432.

> "[The unmistakability doctrine is not implicated here because] the contracts have not been construed as binding the Government's exercise of authority to modify banking regulation or of any other sovereign power, and there has been no demonstration that awarding damages for breach would be tantamount to any such limitation...... The contracts have been read as solely risk-shifting agreements and [the S & Ls] seek nothing more than the benefit of promises by the Government to insure them against any losses arising from future regulatory change. They seek no injunction against application of the law to them."

*Id.* at 881, 116 S.Ct. 2432.

> "[A] contract to adjust the risk of subsequent legislative change does not strip the Government of its legislative sovereignty."

*Id.* at 889, 116 S.Ct. 2432.

The plurality opinion also held that "[t]he facts of this case do not warrant application of the [sovereign acts] doctrine." *Winstar* at 891, 116 S.Ct. 2432.

> "[That doctrine] balances the Government's need for freedom to legislate with its obligation to honor its contracts by asking whether the sovereign act is properly attributable to the Government as contractor..... If the Government is to be treated like other contractors, some line has to be drawn .... between regulatory legislation that is relatively free of Government self-interest and therefore cognizable for the purpose of a legal impossibility defense and, on the other hand, statutes tainted by a governmental object of self-relief."

*Id.* at 896, 116 S.Ct. 2432.

> "Our holding [is] that a governmental act will not be public and general if it has the substantial effect of releasing the Government from its contractual obligations .... In the present case, it is impossible to attribute the exculpatory 'public and general' character to FIRREA..... The statute not only had the purpose of eliminating the very accounting gimmicks that acquiring thrifts had been promised, but the specific object of abrogating enough of the acquisition contracts as to make that consequence of the legislation a focal point of the congressional debate."

*Id.* at 899–900, 116 S.Ct. 2432.

> "FIRREA had the substantial effect of releasing the Government from its own contractual obligations [which] .... precludes a finding that the statute is a 'public and general' act for purposes of the sovereign acts defense."

*Id.* at 902–03, 116 S.Ct. 2432.[7]

In a concurring opinion authored by Justice Scalia (joined by Justices Kennedy and Thomas), three justices agreed that "the contracts at issue .... gave rise to an obligation on the part of the Government to afford respondents favorable accounting treatment, and that the contracts were broken by the Government's discontinuation of that favorable treatment, as required by FIRREA ...." *Winstar* at 919, 116 S.Ct. 2432. However, the concurring justices took issue with the plurality's reasoning that the

---

7. Justice Souter's analysis and application of the "public and general" requirement in pages 899–903 of the opinion speaks only for a three-justice plurality (Justice O'Connor did not join in this part of the opinion).

unmistakability doctrine (and two other sovereign defenses raised by the Government) was inapplicable "simply by characterizing the contracts at issue as 'risk-shifting agreements' that .... purport, not to constrain the exercise of sovereign power, but only to make the exercise of that power an event resulting in liability for the Government." *Id.* "The 'unmistakability' doctrine has been applied to precisely this sort of situation—where a sovereign act is claimed to deprive a party of the benefits of a prior bargain with the government," the concurring justices observed. *Id.* at 920, 116 S.Ct. 2432. Their view is that the unmistakability doctrine applies without regard to the characterization of the contract and that, on the facts of the *Winstar* case, the Government made an unmistakable promise to the S & Ls that it would regulate in a certain fashion into the future.

In a brief discussion of the sovereign acts doctrine, the concurring justices expressed the view that "the 'sovereign acts' doctrine adds little, if anything at all, to the 'unmistakability' doctrine, and is avoided whenever that one would be—i.e., whenever it is clear from the contract in question that the Government was committing itself not to rely upon its sovereign acts in asserting (or defending against) the doctrine of impossibility, which is another way of saying that the Government had assumed the risk of a change in its laws." *Id.* at 923–24, 116 S.Ct. 2432.

The two dissenting justices, Rehnquist and Ginsburg, agreed with the concurring justices that the unmistakability doctrine should apply, calling it a "canon of construction" (*Winstar* at 924, 116 S.Ct. 2432) whose application should not depend on the fine distinction drawn by the plurality as to whether the contract is one "bind[ing] the Government to refrain from exercising regulatory authority .... [or] shift[ing] the risk of a change in regulatory rules." *Id.* at 926–27, 116 S.Ct. 2432. Unlike the concurring justices, the dissent viewed the S & L contracts with the Government as not containing an unmistakable promise to insure against future regulatory change. Chief Justice Rehnquist opined further that the plurality opinion renders the

sovereign acts doctrine "a shell." *Id.* at 931, 116 S.Ct. 2432. "I think it preferable .... to leave that law where it is," he wrote, referring to the distinction the Supreme Court has drawn in prior holdings "that the congressional repeal of a statute authorizing the payment of money pursuant to a contractual agreement is a breach of that contract. But as the term 'public and general' implies, a more general regulatory enactment .... cannot by its enforcement give rise to contractual liability on the part of the Government." *Id.* at 933, 116 S.Ct. 2432. (Justice Ginsburg did not join in this part of the dissent dealing with the sovereign acts doctrine.)

### *Plaintiff's Arguments*

Applying the *Winstar* plurality's ruling to the instant case, plaintiff argues that the Navy, in the cost reimbursement provision (FAR 52.216–7—ALLOWABLE COST AND PAYMENT) incorporated in Contract –2100, indisputably agreed to reimburse GDC's executive compensation costs in accordance with the regulations in effect on the date of the contract. Nothing in Contract –2100 purported to bar Congress from enacting Sec. 808 of the FY 98 Authorization Act, plaintiff contends. Rather, the Navy simply agreed to accept the risk that Congress would change the allowability of executive compensation costs so as to breach the Government's cost reimbursement obligations. Thus, according to plaintiff, the Navy was contractually obligated to indemnify General Dynamics in the event of legal changes that diminished its allowable executive compensation costs. Since Contract –2100 did not block the Government's exercise of sovereign power, plaintiff asserts that the unmistakability doctrine is inapplicable, citing *Winstar*. "So long as .... a contract is .... construed to include a risk-shifting component that may be enforced without .... barring the exercise of [sovereign] power, the enforcement of the risk allocation raises nothing for the unmistakability doctrine to guard against, and there is no reason to apply it." *Winstar* at 880, 116 S.Ct. 2432.

As for the sovereign acts doctrine, plaintiff argues that the statutory compensation cap does not constitute a "public and general" act

that would exempt the government from damages for breach of contract. Pointing again to *Winstar*, plaintiff cites the plurality opinion that an act meets the "public and general" criterion of a "sovereign" act "so long as the action's impact upon public contracts is . . . . merely incidental to the accomplishment of a broader government objective." *Winstar* at 898, 116 S.Ct. 2432. Sec. 808 of the FY 98 Authorization Act fails to meet the "public and general" test, plaintiff asserts, insofar as it aims to curtail the Government's existing contractual obligations with respect to allowable executive compensation costs. The impact of this legislation falls squarely on a limited class of government contractors (with cost-type or fixed-price incentive contracts), plaintiff notes, thus involving the Government strictly in its contracting capacity. Though the compensation cap may be seen as serving the general public interest in saving money, the "Government may not forc[e] some people alone to bear public burdens which . . . . should be borne by the public as a whole." *Winstar* at 896–97, 116 S.Ct. 2432 (quoting *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960)).

### Federal Circuit's opinion in Yankee Atomic

Plaintiff expanded its legal argumentation (in its Reply to Defendant's Opposition to Plaintiff's Motion for Partial Summary Judgment) by citing the Federal Circuit's opinion in *Yankee Atomic Electric Company v. United States,* 112 F.3d 1569 (Fed.Cir.1997), *cert. denied,* 524 U.S. 951, 118 S.Ct. 2365, 141 L.Ed.2d 735 (1998), as the only substantive application of the sovereign acts and unmistakability doctrines in the circuit since the Supreme Court's opinion in *Winstar.* In *Yankee Atomic* an electric utility alleged that a federal assessment required by the Energy Policy Act (EPA) of 1992 based on the utility's use of enriched uranium supplied by the Government breached the Government's prior contract with the utility to supply the uranium at a fixed price. The EPA assessment was not a surcharge on the price the Government charged Yankee Atomic and other utilities for enriched uranium. Rather, it was a special assessment levied against all domestic utilities that purchased enriched uranium either directly or indirectly from the Government for the purpose of partially funding the clean-up (decontamination and decommissioning) of old uranium enrichment plants. In deciding the case the Federal Circuit applied the sovereign acts doctrine and the unmistakability doctrine in a sequential, two-step analysis. The court first considered whether the EPA legislation had the broad public purpose of a sovereign act (as opposed to an act by the Government-as-contractor). Only after concluding that the EPA qualified as a public and general "sovereign act" did the court proceed to determine whether the plaintiff's contract included an unmistakable promise by the Government that it would not exercise that sovereign power.

In discussing the sovereign acts doctrine, the Federal Circuit quoted liberally from the *Winstar* plurality opinion and concluded that the doctrine "is not a hard and fast rule, but rather a case-specific inquiry that focuses on the scope of the legislation in an effort to determine whether, on balance, that legislation was designed to target prior governmental contracts." *Yankee Atomic* at 1575. Turning to the case before it, the Federal Circuit stated:

"Under the sovereign acts doctrine, therefore, we must decide whether the Government, in enacting the relevant provisions of the Energy Policy Act of 1992, was (i) acting for the purpose of retroactively increasing the price of its earlier contracts with Yankee Atomic (i.e., the legislation was passed for the benefit of the Government-as-contractor) or (ii) acting for the purpose of solving the problem of decontamination and decommissioning of uranium enrichment facilities (i.e., the legislation was passed for the benefit of the public)."

*Id.*

The Federal Circuit determined that the Government was acting for the latter purpose (for the benefit of the public), reasoning that:

"The reach of the Act . . . . makes clear that Congress was not focused on a retroactive increase in the price of the Govern-

ment's prior contractual agreements. Rather than targeting those utility companies that had prior contracts with the Government, the Act targets whichever utility eventually used and benefitted from the DOE's enrichment services. [The assessment did *not* apply to utilities that had purchased enrichment services from the Government but resold them to another utility, while it *did* apply to utilities that had no contractual relationship with the Government but purchased their enrichment services from the secondary market.] Congress's main purpose was to spread the costs of a problem that it realized only after the contracts had been performed..... It did so by dividing the costs between: (i) the Government, which was responsible for at least $330 million per year to be raised through general appropriations, and (ii) those domestic utilities that benefitted from the DOE's uranium enrichment services. Any impact that this approach may have on those utilities with which the Government had prior contracts is 'merely incidental to the accomplishment of a broader governmental objective.' "

*Id.* at 1575–76 (quoting *Winstar* at 898, 116 S.Ct. 2432).

The court wrapped up its discussion of the sovereign acts doctrine by concluding that the special assessment under the EPA "constitutes a general exercise of Congress's taxing power for the purpose of addressing a societal problem rather than an act that retroactively increases the price charged to contracting parties for uranium enrichment services." *Id.* at 1577.

The Federal Circuit then proceeded directly to the second step of its analysis—the unmistakability doctrine. "We must further consider," the court wrote, "whether the Government, by contract with Yankee Atomic, has surrendered the right to exercise this sovereign power [to levy an assessment under the EPA] 'in terms which admit of no other reasonable interpretation' " *Id.* (quoting *Merrion* at 148, 102 S.Ct. 894). After discussing the Supreme Court's divided opinion with respect to the application of the doctrine in *Winstar*, the Federal Circuit decided that:

"Based on the reasoning contained in the *Winstar* opinions, we conclude that the unmistakability doctrine applies in the present case. This conclusion respects the views of the five justices who stated that the application of the doctrine is unrelated to the nature of the underlying contracts. In addition, our conclusion is in harmony with the views of the plurality justices. To be sure, the contracts at issue in the present case may be viewed as risk-shifting agreements, similar to those that the *Winstar* plurality found not to implicate the unmistakability doctrine..... *Importantly, however, the plurality also expressly stated that application of the unmistakability doctrine turns on whether enforcement of the contractual obligation would effectively block the exercise of a sovereign power of the Government* [emphasis added]..... [T]he assessment at issue in the present case is a general, sovereign act. Although Yankee Atomic seeks money damages, its argument would effectively block the exercise of this sovereign power to tax ...."

*Yankee Atomic* at 1579.

Thus, the Federal Circuit concluded that the unmistakability doctrine applied to the facts of *Yankee Atomic*. The court then had to decide "whether the contracts between Yankee Atomic and the Government unmistakably precluded the Government from subsequently exercising its sovereign power to assess a tax." *Id.* It concluded that "no such promise existed in the contracts." *Id.* The court reasoned that:

"From examining the contracts, we decide that the fixed-price terms of the contract do not constitute an unmistakable promise on behalf of the Government that it will not impose a general assessment upon all utility companies that benefitted from the DOE's uranium services. The language of the contract is directed at the prices charged for providing enriched uranium to Yankee Atomic, and not to any decontamination or decommissioning costs which may subsequently arise..... To the extent that the Court of Federal Claims implied an unmistakable promise from the legislative acts, we conclude that it erred. Put

simply, a specific promise implied from general legislative acts is not an unmistakable one."

*Id.* at 1580.

### Plaintiff's Arguments

Applying *Yankee Atomic* to the case at bar, plaintiff argues that Sec. 808 of the FY 98 Authorization Act does not meet the definition of a "public and general" act, as set forth in *Winstar,* because it narrowly targets existing government contractual obligations in order to save money. The executive compensation cap applies only to a certain class of government contractors (with cost-type or fixed-price incentive contracts), plaintiff points out, and has no general applicability to entities that do not contract with the Government. In addition, the statutory cap serves no broader public purpose since its sole aim is to limit the amount of money paid by the Government to its contractors. In short, plaintiff asserts that the executive compensation cap is not a "public and general" act within the meaning of the sovereign acts doctrine. Accordingly, the Government cannot invoke this doctrine as a defense to excuse its liability for the breach of Contract −2100 that resulted from the enactment of the Sec. 808 cap. Since the statutory cap is not a "public and general" sovereign act, plaintiff concludes, *Yankee Atomic* dictates that the unmistakability doctrine is inapplicable.

Even if the executive compensation cap were a "public and general" act, plaintiff argues, Contract −2100 contains an unmistakable promise that the Government would *not* change the contractual formula for calculating allowable costs. Through its incorporation of FAR 52.216–7, which provides that "[t]he Government shall make payments to the Contractor .... in amounts determined to be allowable .... in accordance with *subpart 31.2 of the [FAR] in effect on the date of this contract* and the terms of this contract" (emphasis added), the contract immunized GDC from the application of an executive compensation cap enacted nearly two years after the effective date of Contract −2100. This language is unmistakable, in plaintiff's view, and would preclude the Government from prevailing on the unmistakability defense even if the executive compensation cap were a "public and general" act.

### Government's Defense

The Government's basic defense is that "enactment of the Section 808 Compensation Cap did not breach Contract −2100 because the contract does not contain an unmistakable promise [1] that the Government will not exercise its sovereign authority to enact legislation that alters the extent to which senior executive compensation costs are allowed as indirect costs upon Government contracts or [2] that the Government will indemnify GDC for any loss sustained as a result of the enactment of such legislation." (Defendant's Opposition to Plaintiff's Motion for Partial Summary Judgment at 3.) Thus, the Government rests its defense solely on the unmistakability doctrine, and does not raise the sovereign acts doctrine as a defense. Indeed, the Government at oral argument expressly rejected the sovereign acts defense in this case.

Countering plaintiff's initial argument, which is based on the plurality opinion in *Winstar,* that the unmistakability doctrine is not applicable because the risk-shifting component of Contract −2100 did not implicate the Government's exercise of sovereign power, the Government contends that subsequent decisions of the Federal Circuit and the Court of Federal Claims analyzing *Winstar* indicate that the doctrine does apply to the case at bar. In *Yankee Atomic,* the Government points out, the Federal Circuit noted that a majority of the justices in *Winstar* disagreed with the plurality's conclusion that the unmistakability doctrine was not applicable in that case. The three concurring justices and the two dissenting justices all considered the doctrine applicable regardless of whether the contracts were characterized as risk-shifting agreements or promises to refrain from exercising sovereign power (though they disagreed as to whether the "Winstar" contracts contained unmistakable promises by the Government to the S & Ls of fixed regulatory treatment). The reasoning of this five-justice "majority" was cited by the Court of Federal Claims in three recent opinions (*Adams v. United States,* 42

Fed.Cl. 463 (1998); *Franconia Associates v. United States,* 43 Fed.Cl. 702 (1999), reconsideration denied, 44 Fed.Cl. 315 (1999); and *Grass Valley Terrace, a California Limited Partnership, et al. v. United States,* 46 Fed. Cl. 629 (2000), discussed *infra* ) as its rationale for applying the unmistakability doctrine in those breach of contract claims.

In reply to plaintiff's subsequent argument, based on *Yankee Atomic,* that the court must first determine whether Sec. 808 of the FY 98 Authorization Act was "public and general" within the meaning of the sovereign acts doctrine before applying the unmistakability doctrine, the Government contends that the Federal Circuit's analysis of the two doctrines should not be construed as a two-step approach necessitating a finding that the subject legislation is a "public and general" sovereign act before the unmistakability doctrine can even be applied. The Government points out that all nine justices in *Winstar* discussed whether the unmistakability doctrine was applicable before addressing the question of whether the legislation breaching the contracts was "public and general" within the meaning of the sovereign acts doctrine. Moreover, defendant argues that three cases decided in the Court of Federal Claims since *Yankee Atomic* (*Adams, Franconia,* and *Grass Valley Terrace* ) have followed the reasoning of the concurring and dissenting justices in *Winstar* by applying the unmistakability doctrine without regard to the nature of the governmental act.

### Adams, Franconia, and Grass Valley Terrace

These cases, decided in the Court of Federal Claims, involved the enactment of federal legislation that restricted owners of low-income rental housing from prepaying loans they had received from the Farmers Home Administration pursuant to the Housing Act of 1949. The plaintiffs contended that the subject legislation breached their prior loan agreements, which contained clauses (1) permitting prepayment "at any time at the option of the Borrower" and (2) providing that the agreements were "subject to the present regulations of the Farmers Home Administration and to its future regulations not inconsistent with the express provisions hereof." *Adams,* 42 Fed.Cl. at 466, *Franconia,* 43 Fed.Cl. at 704, *Grass Valley Terrace,* 46 Fed.Cl. at 631. In each case, however, the court applied the unmistakability doctrine and determined that the subject contracts were not breached by the Government because they did not contain unmistakable promises that the Government would not exercise its sovereign authority to enact legislation that would frustrate performance of the contracts, including the prepayment rights. *Adams* at 484, *Franconia* at 714–15, *Grass Valley Terrace* at 639–40. In *Adams,* the court applied the unmistakability doctrine even after determining that the subject legislation was not "public and general" within the meaning of the sovereign acts doctrine. In *Franconia* and *Grass Valley Terrace,* the court applied the unmistakability doctrine without discussing the sovereign acts doctrine at all.[8]

### Summation: Yankee Atomic offers best analytical framework

■ Thus, the principal court opinions relied upon by the parties to this action offer a variety of legal theories and doctrinal analysis which could be applied to the facts in this case. The lack of consensus, vividly reflected in *Winstar,* is acknowledged by courts and commentators alike.[9] After careful review of the legal reasoning presented in

8. None of these three opinions mentioned an earlier case decided by the Court of Federal Claims, *Conoco, Inc., et al. v. United States,* 35 Fed.Cl. 309 (1996), which treated the unmistakability doctrine quite differently. *Conoco,* which was the subject of appellate review by the Federal Circuit and the Supreme Court, is discussed later in this opinion.

9. As Prof. John Cibinic, Jr. wrote in a recent article: "It is simply not possible to reconcile the various views expressed by the Justices in *Wins-*

*tar.*" Cibinic, *Retroactive Legislation and Regulations and Federal Government Contracts,* ALABAMA LAW REVIEW, Vol. 51, No. 3, 963, 974 (Spring 2000). In another article in the same law journal, Prof. Joshua I. Schwartz characterized "the fragmented set of opinions rendered by the Supreme Court in *Winstar* " as a "delphic puzzle." Schwartz, *Sovereign Acts & Unmistakability After Winstar,* ALABAMA LAW REVIEW, Vol. 51, No. 3, 1177, 1199 (Spring 2000).

the briefs and cited opinions, however, this court adopts the analytical approach set forth by the Federal Circuit in deciding *Yankee Atomic*. That was a two-step analysis which first explored the question of whether the governmental action preventing performance of a contract was a "public and general" act within the meaning of the sovereign acts doctrine. After an affirmative conclusion on that issue, the second question to explore was whether the contract contained an unmistakable promise that the Government would refrain from exercising its sovereign power in a way that could block performance of the contract. If the answer to that question was also yes, then the governmental action at issue would constitute a breach of contract.

Though the language of the Federal Circuit may not have been crystal clear as to whether its consideration of the second question was contingent on a positive answer to the first question, in this court's judgment the opinion admits of no other reasonable interpretation. The pertinent wording reads as follows: "[W]e conclude that [the subject legislation] constitutes a general [and public act]..... This conclusion does not end our inquiry, however. We must further consider .... and apply the unmistakability doctrine." *Yankee Atomic* at 1577. If the Federal Circuit had meant to decide *Yankee Atomic* on the basis of the unmistakability doctrine regardless of whether the legislation at issue in that case was a "public and general" act, there would have been no reason for the court to apply, and discuss at length, the sovereign acts doctrine for the purpose of determining the nature of the act. That exercise would have been a waste of time.

Consistent with the Federal Circuit's treatment of the sovereign acts doctrine in *Yankee Atomic*, it is essential for this court to determine whether a governmental act that impacts upon the Government's performance of a contract qualifies as a "public and general" act. If it does not, then the Government is not entitled in a court of law to any more favorable treatment, in the matter of contract interpretation, than that accorded to private persons. As the Supreme Court (plurality) stated in *Winstar*, "allow-

ing the Government to avoid contractual liability merely by passing any 'regulatory statute' would flout the general principle that '[w]hen the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals.'" *Winstar* at 895, 116 S.Ct. 2432 (quoting *Lynch v. United States*, 292 U.S. 571, 579, 54 S.Ct. 840, 78 L.Ed. 1434 (1934)). "Careful attention to the cases shows that the sovereign acts doctrine was meant to serve this principle, not undermine it." *Id.*

### *Sovereign Acts Doctrine—Is the Sec. 808 compensation cap a "public and general" act?*

"A governmental act will not be public and general if it has the substantial effect of releasing the Government from its contractual obligations." *Winstar* at 899, 116 S.Ct. 2432. Under this criterion Sec. 808 of the FY 98 Authorization Act was not a "public and general" act, since a major purpose of the executive compensation cap was to pare federal expenses by applying it to pre-existing federal contracts. This fact is clearly evident in the legislative history of the Act. See 143 CONG. REC. S7145, S7169–79 (July 10, 1997).

Sen. Boxer, speaking in support of a proposed amendment to the Senate version of the bill—"REIMBURSEMENT FOR EXCESSIVE COMPENSATION OF DEFENSE CONTRACTOR PERSONNEL PROHIBITED."—stated that:

"[w]hat we do is permanently cap taxpayer-funded compensation .... Right now .... executives and companies who contract with this Government have no limit on what they can get from the Government..... This amendment will ensure that taxpayers are no longer forced to foot the bill for exorbitant salaries of contractor executives."

143 CONG. REC. at S7169–70.

Later in the debate another proponent of the bill, Sen. Lieberman, declared that:

".... in some ways [the amendment] is tighter than any of the limitations in law today for the simple reason that, unlike those limitations, *our provision would ap-*

*ply to all costs charged on all defense and nondefense contracts regardless of when the contracts may have been entered."*

*Id.* at S7179 (emphasis added).[10]

While there is no question that the Government had the sovereign right to enact a prospective executive compensation cap—*i.e.,* applicable to any and all government contracts executed after the act was passed—the application of the Sec. 808 cap to pre-existing contracts, like Contract –2100, constituted an abrogation of the Government's contractual obligations. Thus, it is a classic example of legislation "attributable to the Government as contractor" and "tainted by a governmental object of self-relief." *Winstar* at 896, 116 S.Ct. 2432.

As the *Winstar* plurality specifically noted, in discussing the parameters of sovereign power, "[t]he Government could not, for example, abrogate one of its contracts by a statute abrogating the legal enforceability of that contract, Government contracts of a class including that one, or simply all Government contracts. No such legislation would provide the Government with a defense under the sovereign acts doctrine." *Id.* at 879, 116 S.Ct. 2432. In this court's judgment, therefore, Sec. 808 of the FY 98 Authorization Act is not a "public and general" act within the meaning of the sovereign acts doctrine, and the Government, even if it wanted to, could not successfully invoke the "sovereign act" defense in this case.

### Unmistakability Doctrine— Is it applicable?

■ Having determined that the executive compensation cap, with respect to pre-existing contracts, is not a "public and general" act within the meaning of the sovereign acts doctrine, the court must now address the question as to whether the unmistakabili-

ty doctrine should be applied in determining whether the cap breached Contract –2100. In wrestling with the applicability of the unmistakability doctrine in *Winstar,* the Supreme Court plurality held that:

> "The cases extending back into the 19th century thus stand for a rule [on the unmistakability doctrine] that applies when the Government is subject either to a claim that its contract has surrendered a sovereign power (e.g., to tax or control navigation), or to a claim that cannot be recognized without creating an exemption from the exercise of such a power (e.g., the equivalent of exemption from Social Security obligations). *The application of the doctrine thus turns on whether enforcement of the contractual obligation alleged would block the exercise of a sovereign power of the Government."*

*Winstar* at 878–79, 116 S.Ct. 2432 (emphasis added).

The Federal Circuit cited this reasoning as well in deciding to apply the unmistakability doctrine in *Yankee Atomic.* See *Yankee Atomic* at 1579. It seems clear from the foregoing language that what the Supreme Court and the Federal Circuit had in mind when they referred to sovereign power was that power exercised by government for "public and general" purposes, as opposed to releasing government from its contractual obligations.

■ In the case at bar, however, no such sovereign power is implicated by plaintiff's claim that the Sec. 808 cap breached Contract –2100's provision on allowable executive compensation costs. Enforcement of the contract would not block the exercise of a sovereign power within the contemplation of the *Winstar* plurality—*i.e.,* like taxation, control of navigation, or any other broadly regulato-

10. The Senate debate concerned an unadopted amendment to its version of the executive compensation cap (Sec. 804 of the Senate bill), which with certain modifications was ultimately enacted as Section 808 of the FY 98 Authorization Act. The Government argues that the Senate debate is not evidence of Congressional intent with respect to the Sec. 808 compensation cap because it addressed myriad other issues relating to the bill and referred only fleetingly to the issue of applicability to existing contracts. This argument is unconvincing. The fact is that the Senate debate dealt exclusively with the issue of capping the taxpayer-funded compensation of highly-paid government contractors and Congress subsequently passed an executive compensation cap (Sec.808) embracing features discussed and advocated by Sens. Boxer and Lieberman, including applicability to pre-existing contracts. In short, the Boxer and Lieberman remarks would appear to be an accurate reflection of Congressional sentiment and intent.

ry power exercised by the Government for the "public and general" good. Likewise, enforcement of the contract would not create an exemption from the exercise of a sovereign power since enactment of the executive compensation cap, with its substantial focus on abrogating existing contractual obligations, was not the exercise of a public and general sovereign power as discussed in *Winstar*, but rather an act attributable to the Government as contractor. (If the cap applied solely to contracts executed after passage of the statute, on the other hand, it would pass judicial muster.) Thus, applying the reasoning of *Winstar* and *Yankee Atomic*, enforcement of the allowable executive compensation costs provision in Contract – 2100 would not block the exercise of a sovereign power of the Government. Accordingly, there is no basis to apply the unmistakability doctrine in the case at bar.

This conclusion is consistent with other recent case law. In *Resolution Trust Corporation, et al. v. Federal Savings and Loan Insurance Corporation*, 34 F.3d 982, 984 (10th Cir.1994), another breach of contract action against the Government arising out of FIRREA, the 10th Circuit panel held that *"the 'unmistakability doctrine,' as enunciated in Bowen [supra] .... is irrelevant because the sovereign acts doctrine is not applicable..... [T]he sovereign acts doctrine does not apply because the detrimental effect on private contract rights was the result of targeted agency discretion and not legislation of general applicability enacted for the common good..... Only if the sovereign acts doctrine applied would we be required to address the issue of unmistakability."* (Emphasis added.)

The 10th Circuit's ruling was cited by the Court of Federal Claims in *Conoco, Inc., et al. v. United States*, 35 Fed.Cl. 309, 335 (1996), as authority for the court's statement that *"[t]he unmistakability doctrine stands or falls with the sovereign acts doctrine."* (Emphasis added.) Interestingly, neither party in the instant litigation has discussed the *Conoco* case, which was in legal limbo until a recent ruling by the Supreme Court.

*Conoco* involved a number of oil companies that entered lease contracts with the Government to explore for and develop oil off the coast of North Carolina. The contracts were subject to various statutes and regulations specifically enumerated and incorporated in the contracts. The Government subsequently suspended performance of the contracts pursuant to new restrictions imposed by another piece of federal legislation, the Outer Banks Protection Act (OBPA). This law was enacted subsequent to the execution of the contracts and therefore was not included in the list of statutes and regulations, or their derivatives, originally incorporated in the contracts. The Court of Federal Claims held that the restrictions imposed by the OBPA breached the subject lease contracts. The Government raised the sovereign acts and unmistakability doctrines as defenses, but both were rejected. The court held that:

> "[w]hile the OBPA may have been the result of developing environmental concerns, it was not an act of public, general applicability..... That act was 'principally and primarily' enacted to restrict the [Secretary of Interior's] ability to act on plaintiffs' [exploration plans], thus binding his hands. The OBPA specifically targeted plaintiffs and prevented them from exercising their lease rights."

*Conoco* at 336.

The court concluded that "[t]he OBPA does not constitute a sovereign act" and "[t]he sovereign acts doctrine is no bar to plaintiffs' claims for breach of contract." *Id.* Consistent with its earlier statement that "[t]he unmistakability doctrine stands or falls with the sovereign acts doctrine," *Id.* at 335, the court did not further consider the unmistakability doctrine. The court merely closed with the finding "that neither the sovereign acts doctrine nor the unmistakability doctrine shields defendant from the liability the United States would otherwise bear for breach of contract." *Id.*

The decision by the Court of Federal Claims in *Conoco*—i.e., that the Government breached the lease contracts—was ultimately upheld by the Supreme Court in *Mobil Oil Exploration, Producing Southeast, Inc. v. United States & Marathon Oil Company v. United States*, —— U.S. ——, 120 S.Ct. 2423,

147 L.Ed.2d 528 (2000).[11] In describing the contract law principles it was applying to the case, the Supreme Court began by quoting from its opinion in *Winstar:* "When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private parties." *Winstar* at 895, 116 S.Ct. 2432. The Court then discussed several applicable principles from the Restatement of Contracts, went on to apply them to the contract leases at issue, and concluded "that the Government violated the contracts" because "the new statute, OBPA, required Interior to impose the contract-violating delay" and also "changed pre-existing contract-incorporated requirements in several ways." *Mobil & Marathon,* 120 S.Ct. at 2435. The Supreme Court did not apply either the sovereign acts doctrine or the unmistakability doctrine to the case. The former was dismissed with the cryptic statement that "[t]he Court of Federal Claims rejected the application of that [sovereign acts] doctrine to this case .... and the Government has not contested that determination here." *Id.* The unmistakability doctrine was not even mentioned. Thus, the Supreme Court—like the Court of Federal Claims in the original *Conoco* opinion—applied ordinary rules of contract interpretation (*i.e.,* the law governing contracts between private parties) in deciding the case because the OBPA was not a "public and general" act that could give rise to any sovereign defenses.

This approach is no different than the approach the Supreme Court utilized in two leading and oft-cited cases from the 1930s— *Lynch v. United States,* 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934), and *Perry v. United States,* 294 U.S. 330, 55 S.Ct. 432, 79 L.Ed. 912 (1935). Those cases also involved government contracts breached by federal legislation in which the Court determined that the enactment of the subject laws was not a valid exercise of sovereign power, but

an abrogation of the Government's contractual obligations. The Court applied ordinary rules of contract interpretation and did not even discuss, much less apply, the unmistakability doctrine.

*Lynch* involved war risk insurance policies, issued to servicemen during World War I, that were abrogated by the Government as a cost-saving measure in the Economy Act of 1933, 38 U.S.C. Sec. 717. That law, a piece of New Deal legislation, provided that "[a]ll laws granting or pertaining to yearly renewable term insurance are hereby repealed." In considering whether the Economy Act breached the war risk insurance policies, the Court noted that:

> "When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals..... [T]he due process clause prohibits the United States from annulling them, unless .... the action taken falls within the federal police power or some other paramount power..... No doubt there was in March, 1933, great need of economy..... But Congress was without power to reduce expenditures by abrogating contractual obligations of the United States. To abrogate contracts, in the attempt to lessen government expenditure, would be not the practice of economy, but an act of repudiation."

*Lynch* at 579–80, 54 S.Ct. 840.

In *Perry,* another case involving New Deal legislation, the Court held that the terms of a $10,000 bond requiring the Government to pay in "gold coin" were breached by a Joint Resolution passed by Congress in 1933, 31 U.S.C. Secs. 462, 463(a), which repudiated all government obligations for payment in gold and provided that all government debts were dischargeable by payment, dollar for dollar, in legal tender. In rejecting the Government's argument that Congress was simply

11. The *Conoco* opinion of the Court of Federal Claims was reversed by the Federal Circuit in *Mobil Oil Exploration and Producing Southeast, Inc. v. United States & Marathon Oil Co. v. United States,* 158 F.3d 1253 (Fed.Cir.1998), opinion withdrawn and superceded on rehearing by *Mobil Oil Exploration and Producing Southeast, Inc. v. United States & Marathon Oil Company v.* *United States,* 177 F.3d 1331 (Fed.Cir.1999). Certiorari was granted by the Supreme Court in *Mobil Oil Exploration and Producing Southeast, Inc. v. United States & Marathon Oil Co. v. United States,* —— U.S. ——, 120 S.Ct. 494, 145 L.Ed.2d 381 (1999). The Supreme Court reversed the Federal Circuit in the opinion cited above (*Mobil & Marathon,* 120 S.Ct. 2423).

"exercising its constitutional powers to regulate the value of money, borrow money, or regulate foreign and interstate commerce," *Perry* at 350, 55 S.Ct. 432, the Court wrote that:

"There is a clear distinction between the power of the Congress to control or interdict the contracts of private parties when they interfere with the exercise of its constitutional authority and the power of the Congress to alter or repudiate the substance of its own engagements when it has borrowed money under the authority which the Constitution confers..... When the United States, with constitutional authority, makes contracts, it has rights and incurs responsibilities similar to those of individuals who are parties to such instruments."

*Id.* at 350–52, 55 S.Ct. 432.

Thus, the Supreme Court in *Lynch* and *Perry* clearly indicated that the Government's repudiation of World War I insurance policies and gold bond payment obligations were not valid sovereign acts, but simple breaches of contract. The Court applied ordinary rules of contract interpretation and did not require plaintiffs to prove any "unmistakable promise" by the Government that it would not exercise its sovereign power in a manner that could block performance of the contracts. As the concurring *Winstar* Justices observed: "In neither case [*Lynch* or *Perry* ] did the Court suggest that an 'unmistakable' promise, beyond that discernible using ordinary principles of contract interpretation, was necessary before liability could be imposed on the Government." *Winstar* at 912, 116 S.Ct. 2432.

In summation, the unmistakability doctrine is not applicable in the case at bar because the statutory cap on allowable executive compensation costs (with respect to pre-existing contracts)—Sec. 808 of the FY 98 Authorization Act—is not a "public and general" act within the meaning of the sovereign acts doctrine. Thus, enforcement of the contract provision on allowable executive compensation costs would not block the exercise of a sovereign power of the Government, on which application of the unmistakability doctrine turns. *Winstar* at 879, 116 S.Ct. 2432.

In deciding the issue of breach, therefore, this court will apply ordinary rules of contract interpretation (*i.e.,* the law governing contracts between private parties) to determine whether enactment of the compensation cap breached Contract –2100's provision on allowable executive compensation costs.

### *Executive Compensation Cap breached Contract –2100*

 In construing a contract the court begins with the plain language of the agreement. If the contract language is clear and unambiguous, the court must give the words their ordinary meaning and may not resort to extrinsic evidence. *McAbee Construction, Inc. v. United States,* 97 F.3d 1431, 1435 (Fed.Cir.1996). Contract –2100, which was executed in 1996, incorporated FAR 52.216–7—ALLOWABLE COST AND PAYMENT (JULY 1991), which provides that:

"[T]he Government shall make payments to the Contractor when requested as work progresses .... in amounts determined to be allowable by the Contracting Officer in accordance with *subpart 31.2 of the Federal Acquisition Regulation (FAR) in effect on the date of this contract* and the terms of this contract."

(Emphasis added.)

Under the referenced FAR there were no statutory or regulatory caps on allowable executive compensation costs. Rather, the CACO assigned to GDC's headquarters determined the allowability of executive compensation costs through a discretionary application of the relevant regulations.

In November 1997 the statutory cap on allowable senior executive compensation costs was enacted, effective as to all such costs incurred on or after January 1, 1998. The law was applicable not just to future contracts, but also to pre-existing contracts. Under the implementing regulations subsequently issued by the Administrator for Public Procurement Policy, the cap was set at $340,650 for senior executive compensation costs incurred in fiscal year 1998. As previously noted, the Government has admitted that under the cost standards set forth by FAR subpart 31.2 (effective at the time the

contact was executed) the allowable costs of the GDC executives affected by the compensation cap exceeded the benchmark compensation amount set for fiscal year 1998. Thus, the statutory cap unilaterally reduced the dollar amounts the Government could compensate GDC under the provisions of Contract –2100. The contract language is clear and unambiguous—*the provisions of FAR subpart 31.2 in effect on the date of this contract,* which were incorporated into Contract –2100 through FAR 52.216–7, govern the determination of allowable executive compensation costs. The statutory cap violated this contract provision. The court finds, therefore, that the enactment of Sec. 808 of the FY 98 Authorization Act breached Contract –2100.

Having determined that the breach of contract is clear from the face of the instrument, the court will not consider any extrinsic evidence offered by the parties as to the meaning of the ALLOWABLE COST AND PAYMENT provision of Contract –2100. "When the contract language is unambiguous, the court's inquiry is at an end and the plain language of the contract is controlling." *Goldsmith v. United States,* 42 Fed.Cl. 664, 668 (1999).

Summary judgment is appropriate when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. U.S. Court of Federal Claims Rule 56(c); *Schuerman v. United States,* 30 Fed.Cl. 420, 434 (1994). There are no disputed issues of material fact with respect to the terms of Contract –2100 dealing with allowable executive compensation costs or the substance of the executive compensation cap imposed by Sec. 808 of the FY 98 Authorization Act. Accordingly, GDC is entitled to summary judgment on the breach of contract issue.

### III. *Other Issues*

Though the court has determined that the unmistakability doctrine does not apply in this case, prudence and completeness at the trial level suggest that some additional discussion of the Government's arguments is warranted with respect to the requirements of an unmistakable promise, particularly in view of the unsettled state of the law in this

area. The Government's sole defense to the plaintiff's breach of contract claim is that Contract –2100 does not contain an unmistakable promise that the Government will not exercise its sovereign power to enact legislation altering the extent to which senior executive compensation costs are allowed as indirect costs on government contracts, or that the Government will indemnify GDC for any loss resulting from such legislation. In the court's view, however, even if the executive compensation cap qualified as a "public and general" act obliging the court to consider the unmistakability doctrine, Contract –2100 *does* contain an unmistakable promise by the Government that would preclude the successful use of this defense.

Case law reveals no hard and fast rule as to what constitutes an unmistakable promise. In its synthesis of leading cases on the unmistakability doctrine, the Supreme Court plurality in *Winstar* held that "a contract with a sovereign government will not be read to include an *unstated term* exempting the other contracting party from the application of a subsequent sovereign act (including an Act of Congress), nor will an *ambiguous term* of a grant or contract be construed as a conveyance or surrender of sovereign power." *Winstar* at 878, 116 S.Ct. 2432 (emphasis added). This guideline seems to indicate that an unmistakable promise must be clearly present in the black letter terms of the contract—that it cannot be inferred from surrounding circumstances or extrinsic evidence of the parties' intent. The concurring justices, however, appeared to interpret the unmistakability doctrine more flexibly. Indeed, Justice Scalia wrote that "[i]n my view, the doctrine has little if any independent legal force beyond what would be dictated by normal principles of contract interpretation. It is simply a rule of presumed (or implied) intent. . . . . Governments do not ordinarily agree to curtail their sovereign or legislative powers, and contracts must be interpreted in a commonsense way against that background understanding." *Id.* at 920–21, 116 S.Ct. 2432. In concluding that the *Winstar* plaintiffs met the burden of showing that the Government had unmistakably promised to curtail its sovereign powers, the concurring

Justices wrote that "[t]he special role of the agencies, and the terms and circumstances of the transactions, provide an adequate basis for saying that the promises .... were unmistakable ones." *Id.* at 922, 116 S.Ct. 2432. Thus, the concurring justices looked not just to black letter contract provisions, but also to surrounding circumstances and extrinsic evidence, just as in ordinary contract interpretation. *Winstar's* dissenting justices, on the other hand, criticized both the plurality and concurring justices for lowering the standard of proof established in prior case law—*i.e.*, that "a waiver of sovereign authority will not be implied, but instead must be surrendered in unmistakable terms." *Id.* at 926, 116 S.Ct. 2432. Perhaps the only lesson to be drawn from *Winstar* is that in determining whether a government contract contains an unmistakable promise, for the purposes of the unmistakability doctrine, a court must look to the facts and circumstances of each individual case.

■ Turning to Contract –2100, the "ALLOWABLE COST AND PAYMENT" provision states that "[t]he Government shall make payments to the Contractor .... in amounts determined to be allowable by the [CO] in accordance with *subpart 31.2 of the [FAR] in effect on the date of this contract* ...." (Emphasis added.) This is not an "ambiguous" or "unstated" term within the contemplation of the *Winstar* plurality, *supra.* The quoted language is crystal clear and lends itself to only one reasonable interpretation—*i.e.*, that the cited regulation (the version in force on the date Contract –2100 was executed in 1996) is controlling with respect to the method of determining allowable executive compensation costs to GDC for the duration of the contract. In the court's judgment, this unambiguous language constitutes an "unmistakable promise" by the Government that it would not exercise its sovereign power to change the method of determining allowable executive compensation costs in Contract –2100. The unmistakable promise is inherent in the black letter wording of the "ALLOWABLE COST AND PAYMENT" provision. Therefore, even if the executive compensation cap were a "public and general" (sovereign) act, the court

finds that the unmistakability doctrine would be of no help to the Government.

Defendant argues (in its Surreply at 11) that the pertinent contract language—providing that payments be made to the contractor in allowable amounts under the applicable *Federal Acquisition Regulation* in effect on the date of the contract—does not constitute "an express promise by the Government that the extent of the contractor's allowable costs cannot be affected by, i.e., will be exempt from, subsequent *legislation* concerning allowable costs." (Emphasis added.) The court finds defendant's argument unpersuasive. The unmistakability doctrine does not make the kind of distinction the Government is trying to draw between regulatory and legislative acts of Government. The doctrine, as reiterated by the Supreme Court in *Winstar*, states clearly and simply that "sovereign power .... governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms." *Winstar* at 872, 116 S.Ct. 2432. "Sovereign power" embraces all acts of government—be they regulatory, legislative, or Presidential orders! When the performance of an unmistakable promise in Contract –2100 was rendered impossible by the enactment of the Sec. 808 cap, it made no difference that the governmental act was legislative, as opposed to regulatory (though it was the regulatory act of setting the benchmark compensation amount that actually implemented the statute). Enactment of the subject legislation was an exercise of sovereign power within the contemplation of the unmistakability doctrine (assuming, arguendo, that the executive compensation cap was a "public and general" act) and it breached the Navy's contract with GDC.

Defendant's remaining arguments likewise fail to exculpate the Navy from its unmistakable promise in Contract –2100. The Government contends that the instant case is distinguishable from *Winstar* (in which the Supreme Court found that an essential part of the *quid pro quo* was continued favorable regulatory treatment by the Government) because the essential subject matter of Contract –2100 was not a promise to regulate in a certain fashion into the future. In the

court's view, however, the promise of fixed contractual treatment of allowable costs is an essential and central element of a cost-plus-fixed-fee contract, like Contract –2100, and it endures for the life of the contract. Moreover, an unmistakable promise of fixed legislative and regulatory treatment of allowable costs was incorporated in the contract through FAR 52.216–7.

Defendant also argues that fixed legislative treatment was not a basic assumption of the contracting parties—*i.e.*, that the enactment of the executive compensation cap was an event that plaintiffs should have foreseen—because the underlying federal statute concerning non-allowable contractor costs, 10 U.S.C. Sec. 2324(e)(1), had already been amended numerous times, and on two previous occasions the amendments (like the Section 808 cap) applied to existing contracts. The amendments cited by the Government— P.L. 100–370, Sec. (1)(f)(2)(A), 102 Stat. 846 (July 19, 1988) and P.L. 101–189, Sec. 311(a), 103 Stat. 1411 (Nov. 29, 1989)—added two new categories to the list of "specific costs not allowable" in defense contracts under 10 U.S.C. Sec. 2324(e)(1).[12] Unlike Sec. 808 of the FY 98 Authorization Act, however, which specifically applied to "covered contracts entered into before, on or after the date of enactment" (P.L 105–85, Sec. 808(e)(2)), the 1988 and 1989 amendments contained no provisions concerning which contracts they covered. The Government draws the questionable conclusion that the amendments therefore applied to pre-existing contracts, like the Sec. 808 cap. But this contention, as far as the record indicates, has never been tested in a court of law. Moreover, the Government's contention conflicts with Sen. Lieberman's statement during the Senate debate on the executive compensation cap in 1997, *supra*, that the proposed amendment

"is tighter than any of the limitations in law today [because], unlike those limitations, our provision would apply to all costs .... regardless of when the contracts may have been entered." Thus, defendant has failed to establish that the 1988 and 1989 amendments to 10 U.S.C. Sec. 2324(e)(1) have any bearing on the case at bar. Furthermore, even if the Government could establish, arguendo, that the 1988 and 1989 amendments applied to pre-existing contracts, the contract at issue in this litigation, as previously discussed, contained an unmistakable promise of fixed legislative and regulatory treatment protecting plaintiff from any similar governmental acts (like the Section 808 cap of the FY 98 Authorization Act). The language of Contract –2100's "ALLOWABLE COST AND PAYMENT" provision makes the parties' basic assumption abundantly clear.

### Conclusion

In accordance with the foregoing discussion, the court GRANTS the motion of plaintiff, General Dynamics Corporation, for summary judgment on the issue of liability. The court denies defendant's cross motion to dismiss. The complaint of Electric Boat Corporation (No. 99–865C) is dismissed without prejudice.

The parties are directed to advise the court as soon as possible as to their intentions regarding further proceedings in Case No. 99–45C.

---

12. The 1988 amendment, P.L. 100–370, Sec. 1(f)(2)(A), disallowed the costs of commercial insurance for losses associated with correction of a contractor's own defective materials or workmanship. The 1989 amendment, P.L. 101–189, Sec. 311(a), disallowed the costs of severance pay paid by the contractor to a foreign national employed by the contractor under a service contract performed in a foreign country if the termination of that person's employment resulted from the closing of, or curtailment of activities at, a U.S. military facility in that country at the request of the country's government.